**UNITED STATES v. HAYES et al. SAME v. CIMARRON RIVER OIL CO. et al. RIVERSIDE OIL & REFINING CO. v. SAME.**

Circuit Court of Appeals, Eighth Circuit.
May 28, 1927.

Nos. 7119, 7163, 7166.

1. **Appeal and error** ⬥338(1)—**Appeal granted April 10th from decree entered January 31st was timely.**

In action to quiet title to river bed oil lands, in which decree was entered January 31st, appeal granted April 10th was taken and filed within time required by law.

2. **Appeal and error** ⬥612(2)—**Where decree was entered in Eastern district of Oklahoma, before Northern district was created, transcript on appeal held properly certified by clerk of Eastern district (Comp. St. § 1088e).**

Where decree was entered in Eastern district of Oklahoma before enactment of Act Feb. 16, 1925, § 1 (Comp. St. § 1088), creating Northern district, and after appeal was perfected two of appellees moved to have cause removed to Northern district under section 6 thereof (Comp. St. § 1088e), transcript *held* properly certified by clerk of Eastern district, since at time of motion to remove cause trial court had no jurisdiction, in so far as portions of decree appealed from were concerned, except to perfect record.

3. **Appeal and error** ⬥150(1)—**Lessee of river bed from state and receiver acting during litigation held to have interest justifying appeal from decree quieting title in riparian owners.**

In action by United States, as guardian and trustee of tribal property of Creek Nation, to quiet title to river bed oil lands, lessee of portion of river bed claiming under lease from state, which intervened, and from receiver, acting during litigation, *held* to have interest in controversy, entitling them to appeal from adverse decree.

4. **Appeal and error** ⬥786—**In action to quiet title to Cimarron river bed, appeal of United States and lessee from state held not frivolous as to appellees holding under unallotted land deed to purchaser, approved by Secretary of Interior after statehood of Oklahoma.**

In action by United States, as guardian and trustee of tribal property of Creek Nation, to quiet title to Cimarron river bed oil lands, appeal of United States and lessee from state *held* not frivolous as to appellees holding under unallotted land deed approved by Secretary of Interior after statehood of Oklahoma on June 27, 1912.

5. **Appeal and error** ⬥1078(1)—**Appellant is deemed to have waived assignment not argued.**

Where assignment is not argued on appeal, appellant must be deemed to have waived it.

6. **Navigable waters** ⬥37(7)—**Whether conveyance by surveyed meander lines carries title to river bed to thread of stream depends on intention of parties.**

As general rule, whether conveyance by surveyed meander lines carries title to river bed to thread of stream is matter of intention of parties to conveyance.

7. **Indians** ⬥13(1)—**Court must make effective intention of parties as expressed in entire agreement for allotment of Creek Indian lands (31 Stat. 861; 32 Stat. 500).**

In construing allotment agreement between government and Creek Indians, provided for by Act March 1, 1901 (31 Stat. 861), and Act June 30, 1902 (32 Stat. 500), court must make effective intention of parties as expressed in entirety of agreement.

**8. Indians ⊚=>13(1)—In construing agreement for allotment of Creek Indian lands, court must consider conditions affecting parties at time agreements were made (31 Stat. 861; 32 Stat. 500).**

In construing agreement for allotment of Creek Indian lands, provided for in Act March 1, 1901 (31 Stat. 861), and Act June 30, 1902 (32 Stat. 500), court must construe all parts of such agreements in light of purposes in view, and by conditions surrounding parties and affecting them at time agreements were made.

**9. Boundaries ⊚=>13—Title of riparian allottees and purchasers of unallotted lands of Creek Indians conveyed by meander lines held intended to extend to thread of Cimarron river (31 Stat. 861; 32 Stat. 500; 28 Stat. 286).**

Title of riparian allottees and purchasers of unallotted lands of Creek Indians, conveyed under allotment provided for in Act March 1, 1901 (31 Stat. 861), and Act June 30, 1902 (32 Stat. 500), by meander lines, *held* intended to extend to thread of Cimarron river, so that no interest or title was reserved in or retained by Creek Nation, in view of government's policy to transfer all land, and Act Aug. 15, 1894 (28 Stat. 286), providing that surveys should be in conformity to laws applicable to public domain.

**10. Statutes ⊚=>184—Words of statute may be qualified by surroundings and connections to attain object.**

Language of statute is to be interpreted in light of particular matter in hand and object sought to be accomplished, as manifested by other parts of act, and words used may be qualified by their surroundings and connections.

**11. Indians ⊚=>3—In scrutinizing provisions of treaty with Indians to ascertain intention of parties, court should not disregard obvious import of words employed.**

While dependent character of Indian requires court to closely scrutinize provisions of treaty to ascertain intention of parties, it must not disregard obvious import of words employed, and thereby in effect determine questions of mere governmental policy.

Appeals from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Actions by the United States, as guardian and trustee of the tribal property of the Creek Nation, against W. N. Hayes and others, and against the Cimarron River Oil Company and others, lessees of river bed lands of the Cimarron river, in which the State of Oklahoma filed an intervention, and other parties also intervened. From the decree, the United States and the Riverside Oil & Refining Company appeal. Affirmed.

H. B. Martin, Sp. Counsel for Creek Tribe or Nation of Indians, of Tulsa, Okl., and Eustace Smith, Sp. Asst. U. S. Atty. Gen., for the United States.

J. F. Sharp, of Oklahoma City, Okl. (C. M. Oakes, of Tulsa, Okl., and Stuart, Sharp & Cruce, of Oklahoma City, Okl., on the brief), for appellant Riverside Oil & Refining Co.

W. A. Ledbetter, of Oklahoma City, Okl. (H. L. Stuart, R. R. Bell, and E. P. Ledbetter, all of Oklahoma City, Okl.), for various oil companies and individuals who operated oil and gas wells in river beds under orders of District Court.

C. B. Ames, of Oklahoma City, Okl. (B. A. Ames, of Oklahoma City, Okl., J. H. Hill, of Tulsa, Okl., and Ames, Lowe & Cochran, of Oklahoma City, Okl., on the brief), for appellee Texas Co.

J. P. O'Meara, of Tulsa, Okl., and A. E. Graham, of Okmulgee, Okl. (Gray Carroll and M. H. Silverman, both of Tulsa, Okl., on the brief), for appellees Fixico and others.

Streeter B. Flynn, of Oklahoma City, Okl. (Robert M. Rainey, Calvin Jones, and Rainey, Flynn, Green & Anderson, all of Oklahoma City, Okl., on the brief), for appellee Shaffer Oil & Refining Co.

Augustus C. Sewell, of McAlester, Okl. (W. J. Crump and James C. Davis, both of Muskogee, Okl., on the brief), for appellees Mussellem.

R. W. Stoutz, of Tulsa, Okl. (W. E. Disney and John Wheeler, both of Muskogee, Okl., and Anthony P. Nugent, of Kansas, Mo., on the brief), for appellees Rector and others.

W. P. McGinnis, of Tulsa, Okl. (Y. P. Broome and J. C. Wilhoit, both of Tulsa, Okl., on the brief), for appellee Tidal Oil Co.

J. H. Mosier, of Muskogee, Okl., Earl Bohannan, of Oswego, Kan., and H. M. Gray, of Tulsa, Okl., for appellee Parker.

W. H. Wilcox and A. R. Swank, both of Stillwater, Okl., for appellees Way and Potts.

Chas. West, Everett Petry, and West & Petry, all of Tulsa, Okl., for appellees Oklahoma Land, Coal & Petroleum Co. and others.

G. Earl Shaffer, of Tulsa, Okl., for appellee Ellis.

John J. Shea and Thos. F. Shea, both of Tulsa, Okl., for appellees Carney and others.

Shea & Shea, of Tulsa, Okl., for appellees Hello and others.

Before STONE, KENYON, and BOOTH, Circuit Judges.

STONE, Circuit Judge. In pursuance of the Treaties of 1826 (7 Stat. 286), 1832 (7 Stat. 366), and 1833 (7 Stat. 417), the

United States issued a patent, dated August 11, 1852, to the Muscogee or Creek Tribe of Indians to a large body of land which included portions of the Arkansas river and of its tributary, the Cimarron river. This grant was to the Creeks as a nation and not to the individual members of that tribe. Treaty, 7 Stat. 417, 419; patent, paragraphs "Art. III" and "Art. IV" and the granting clause. This grant was in the nature of a defeasible or terminable fee, being "in fee simple * * * so long as they shall exist as a nation, and continue to occupy the country hereby assigned to them." Treaty, 7 Stat. 417, 418; patent, paragraph "Art. III," and the granting clause.

The tribe, as such, occupied this land until the allotment thereof to the individual tribal members, or the sales thereof of lands not so allotted, under the Acts, or Agreements, of March 1, 1901 (31 Stat. 861), and June 30, 1902 (32 Stat. 500). These allotments and these sales were in accordance with a survey made, in advance of the above acts, by the United States for that purpose. This survey did not include the beds of the two rivers but meandered the banks thereof. Some years after such allotments or sales of the lands which bordered these rivers, oil was discovered in the beds of these streams adjacent to such lands.

The state of Oklahoma then made claim to such river bed lands on the basis that these streams were there navigable. In 1912 and 1913, the state granted oil and gas development leases covering various portions of these river bed lands. December 27, 1913, the United States, as guardian and trustee of the tribal property of the Creek Nation, brought two actions in its behalf. One was against the above lessees of such river bed lands of the Arkansas river. The other, against such lessees of river bed lands of the Cimarron river. So far as the question to be determined here is concerned, the two cases moved as companions and a recital of the proceedings in one of them will apply to the other. The final decrees in the two cases were not identical in all respects but were the same in so far as the three appeals to be considered in this opinion are concerned. The same day, the state of Oklahoma filed its intervention laying claim to these river bed lands. The same day, was filed a stipulation executed for complainant and intervener (state of Oklahoma). This stipulation was rather extended and formal but, in brief, provided for development under and in accordance with the terms of the existing leases, for a "supervisory committee" of two named

persons (one selected by complainant and one by intervener) to immediately supervise and control such production, for collection of the royalties thereunder and payment of same to a receiver, to be appointed by the court, who should hold such funds to await the final outcome of the action. This stipulation was "entered into for the sole purpose of hastening the development and conservation of the oil and gas underlying the said lands, and for the protection of whomsoever may ultimately be decreed by the court to be the owner of and entitled thereto, said development and conservation being necessary by reason of the oil and gas development and operation on the adjacent uplands." It concluded with the statement that "any person not now a party to this suit who claims an interest in any of the several tracts or parcels of land described in the bill of complaint herein may be made a party to this cause, and receive the benefits of this stipulation upon subjecting himself to the jurisdiction of this court and agreeing to be bound by the provisions hereof."

December 30, 1913, a receiver was appointed upon application of plaintiff and the intervening state of Oklahoma. This action was consented to by several of the defendants who had then filed answers. This order recognized and *appointed* the "supervisory committee" of two provided for in the above stipulation and decreed that "pending the final determination of this suit," production should proceed under the existing leases made by the state; that the royalties thereunder should be collected and held by the receiver for whomsoever should be adjudged entitled thereto; that separate accounts of production under each lease should be kept and regularly filed; that the lessees should be entitled to keep all proceeds other than royalties free from any claim by plaintiff or "said interveners" and that others might become parties by submitting to the jurisdiction of the court and "agreeing to be bound by the provisions of the said stipulation as filed herein by the complainant and said interveners on the 27th day of December, 1913." Thereafter, numerous parties intervened. These later interveners included allottees of the shore lands adjacent to the river beds under lease, purchasers of unallotted lands so adjacent, grantees of such allottees or of such purchasers, and lessees of such under oil and gas leases covering such upland.

The main issue developed from these actions and the various interventions therein was as to the ownership of these leased riv-

er. bed lands. At first, this was a triangular contention in which there were three classes, each of which claimed an exclusive title. These were the Creek Nation, the state of Oklahoma and the owners (or their lessees) of the adjacent shore lands. During this litigation, the Supreme Court decided a case (Brewer Oil Co. v. United States, 260 U. S. 77, 86, 43 S. Ct. 60, 67 L. Ed. 140), which determined the nonnavigable character of the Arkansas river above the mouth of the Grand river. As the lands here involved were above the mouth of the Grand river, that decision eliminated the state of Oklahoma as a claimant. The state recognized this situation by filing a formal stipulation that a decree might be taken against it. Thereafter the contest as to title was between the Creek Nation on one side and the landowners on the other. The lessees from the state and, later, the lessees from the receiver, developing these river bed lands, formed a class aligned, in interest, with the state at the outset, but under the above stipulation and receivership it became immaterial to them whether the state or the Creek Nation prevailed as in either situation their rights under the leases were recognized and protected. If the landowners prevailed, these lessees might be faced with the claim that they were trespassers or were liable for larger payments than the royalties stipulated in the leases. Therefore. their interests naturally aligned them against the landowners.

The issues were referred to a master, who held extensive hearings and filed a report. The trial court (January 31, 1925) entered the decrees which are the subject of these appeals. Those decrees adjudicated the matters following: The title to the river bed lands; the rights of upland lessees as to the adjacent river bed lands; the status of the leases given by the state or the receiver for operation in the river bed lands; rights of possession in the landowners and the future status of the receivership. The decrees quieted title in the landowners and dismissed the petition filed on the part of the Creek Nation and the intervention of the state. They declared that oil and gas leases given by such landowners should extend to the abutting river bed lands and that all river bed leases given by the state or the receiver be "inoperative from and after this date without prejudice to removal by the lessees of their equipment in accordance with former order of this court and as provided in said leases." They provided that no writ of possession should issue within thirty days nor thereafter except upon hearing; continued the receiver-

ship pending appeals from the decrees and retained jurisdiction for the purposes of adjudicating several matters expressly reserved, of paying out of the funds held by the receiver and of winding up the receivership.

From this decree in the Arkansas River Case an appeal (No. 7119 in this court) was taken by the United States and presents the question of title. From the decree in the Cimarron River Case, three separate appeals were taken as follows: One (No. 7166) by the United States (presenting the question of title); one (No. 7163) by Riverside Oil and Refining Company, a defendant river bed lessee (presenting the question of title); and one (No. 7172) by Sarah Rector, an intervening allottee landowner (presenting the broad question of the measure of recovery by her from the river bed lessees). See Rector v. U. S. (C. C. A.) 20 F.(2d) 845. The four appeals were argued together. The cases were elaborately and completely argued and the court has read, studied and considered each and all of the 24 separate briefs filed therein and acknowledges its debt to counsel for the helpfully thorough and comprehensive presentation of these cases.

A motion to dismiss the appeal of the Riverside Oil & Refining Company has been filed by certain appellees. Four grounds are stated therein, three of which are common to all of the movants and one affects only certain of them.

[1] The first ground is that the appeal was "not taken and filed in the time required by law." The decree appealed from was entered January 31, 1925. This appeal was granted April 10, 1925.

[2] The second ground is that no proper transcript has been filed in this court because the transcript was not certified by the clerk of the Northern district of Oklahoma. This case was filed and the decree here appealed from entered in the Eastern district before the Act creating the Northern district became effective on February 16, 1925 (43 Stat. 945 [Comp. St. § 1088]). After this appeal was perfected, two of the appellees moved (section 6 of that act [Comp. St. § 1088e]) to have the cause removed to the Northern district. At that time no jurisdiction remained in the trial court *in so far as the portions of the decree appealed from are concerned,* except to perfect the record therein. The judge who had entered such decree and before whom the proceedings and evidence upon which it was based were had was the judge of the Eastern district assigned by *the above act to continue as judge of the*

new Eastern district. He alone could pass upon a case made therein. The act contemplates that jurisdiction in such a situation and for such limited purpose should remain where it was. Section 6 of the act requires the clerk, on a transfer, to certify the "record of all orders, interlocutory decrees or other entries" to the new district. This statement evinces a clear intent to leave final decrees undisturbed. We hold that this transcript, certified by the clerk of the Eastern district, is properly here.

[3] The third ground is that this appellant has no appealable interest in the controversy. Appellant is a lessee of a portion of the river bed of the Cimarron river within the former Creek Nation. It claims under a lease from the state and under a lease from the receiver. These appellees are owners of the bordering uplands or of oil and gas leases thereon and both classes dispute the right of appellant to operate under either of the above kind of leases and claim damages for such alleged trespass. Clearly, the appellant has a direct, substantial interest involved which it may bring to this court for review. [4] The fourth ground is that the appeal is frivolous as to certain of these appellees because they "hold under an unallotted land deed to Odelle Farris, purchaser, approved by the Secretary of Interior after statehood and on June 27, 1912, and the case of Oklahoma v. Texas, 258 U. S. 574, 42 S. Ct. 406, 66 L. Ed. 771 is absolutely conclusive." This contention is not well founded. The applicability of the above case is sharply challenged and argued in this appeal.

The motion to dismiss this appeal is denied. Several other motions to dismiss one or more of these appeals or to affirm have been considered, but we think them without merit and they are denied.

This opinion will dispose of the following three appeals: Those of the United States (in cases 7119 and 7166) and that of the Riverside Oil & Refining Company (in case 7163).

[5] The Riverside Oil & Refining Company appeal (No. 7163) states two characters of assignments: Those dealing with title and one dealing with that portion of the decree which terminated the river bed leases as of the date of the decree. It does not argue the latter matter and, therefore, must be deemed to have waived it (Denver Live Stock Comm. Co. v. Lee et al., 18 F.(2d) 11, this court, filed March 17, 1927; Svea F. & L. Ins. Co. v. State S. & L. Ass'n, 19 F.(2d) 134, filed in this court April 11, 1927; Morris v. U. S., 19 F.(2d) 131, filed in this court April 11,

1927; Weare v. U. S., 1 F.(2d) 617, 618, this court; Braden v. U. S., 270 F. 441, 442, this court.

The question presented in each of those appeals is the same and is whether the title to these river bed lands of the Arkansas river and of the Cimarron river is in the Creek Nation or in the various abutting landowners.

The titles of the allottees and purchasers of unallotted lands rest upon deeds given in compliance with and performance of the above Allotment Acts or agreements. The descriptions in these deeds followed the survey lines, which meandered the shores. As to one or two tracts of land this survey line at places departed slightly from the river bank line and some emphasis was placed thereon before the master. However, the trial court approved the conclusion of the master that the intention and effort of the surveyor was to draw a true meander line and we think this view is amply supported by the evidence. As to such tracts, there is no appeal from this determination that the lines there should be treated as meander lines. There was no express grant nor express reservation of the lands in the river beds between the opposite shore meander lines of the survey. If these bed lands are embraced in the deeds, it is because the meander line descriptions are legally sufficient to include them.

[6] With commendable frankness, counsel for the United States say: "We do not question the general rule, that true meanders are not to be treated as boundary lines. * * * " No question is here made that, under the common law and under the civil law, a conveyance by meander lines along a nonnavigable stream would, without more as to intention of the parties, carry title to the stream thread. But counsel contend that neither the common law nor the civil law can control these transactions between an Indian tribe and its members; that the intention of the parties to these deeds must govern the construction thereof; that the pertinent considerations and facts revealing such intention convince that these meander lines were to be limiting boundary lines. In short, the entire strength of such position is that the circumstances controlling these allotments and purchase deeds show an intention not to convey the river beds. Unless the United States is right in this position it must fail. Generally speaking, whether or not a conveyance by surveyed meander lines carries title to the river bed to the thread of the stream, is a matter of intention of the parties to the conveyance (Producers' Oil Co. v. Hanzen, 238

U. S. 325, 339, 35 S. Ct. 755, 59 L. Ed. 1330; Oklahoma v. Texas, 258 U. S. 574, 594, 42 S. Ct. 406, 66 L. Ed. 771) and, even where the common-law or the civil-law rule is operative in this country, the parties may make the meander lines true boundary lines if they so desire (two cases just cited). Therefore, irrespective of the application of such common-law or civil-law rule here, it is necessary to ascertain what the parties here intended.

Who are the parties whose intentions are here involved? Obviously, those who would be affected by these allotments and sales and who were parties to these agreements and conveyances. They were the United States, the Creek Nation and the members of that Nation. The United States was interested because this land would revert to it if, without its consent, the Creek Nation ceased to occupy this land as a tribe, because of its relationship to this tribe and its members, and because of its governmental policies toward the Indians. The interests of the Creek Nation and of the tribal members in this land is evident; it was a complete change in the character of ownership from communal to individual.

Where are the intentions of these parties evidenced? Appellant, United States, states that such intentions are to be found in the above Allotment Acts (the Original Creek Agreement of March 1, 1901, and the Supplemental Agreement of June 30, 1902) as construed in the light of "the particular circumstances and conditions which led up to the conclusion of" these two Agreements. As the conveyances were made by the Creek Nation and were accepted by the allottees or purchasers in compliance with and were authorized only by these two acts, which were in form of agreements between the nation and the United States, we think the above statement of appellant sound. If the intention of the parties is not made clear by such an investigation, we can then examine whether or not the common-law rule or the civil-law rule is applicable.

We shall consider this matter of intention in outline in the order following: First, "the particular circumstances and conditions which led up to the conclusion of the Original and Supplemental Creek Treaties"; second, the agreements and the contentions of appellant in relation thereto.

## Conditions Leading up to the Agreements.

These Allotment Acts or Agreements were not sudden or isolated Congressional enactments. They were culminating steps resulting from a continued course of policy toward these Indians by the government. This policy was the result of the reaction of changing existing conditions upon the rights of the Five Civilized Tribes as those rights were defined in the various treaties and in the land patents based thereon. Those rights were to maintain tribal governments and to hold the patented lands as long as they were occupied by the tribal members as a tribe. At the time the Indians of these tribes removed to the Indian Territory country, each had its tribal government which controlled its members. One feature of that government was common or communal holding of land. The Indians were jealous of any control or interference in their governmental matters by the white man. They wished to live their own lives according to their immemorial customs and forms of control. They wished to live apart from and untroubled by white men among them. They were going to an uninhabited region much removed from the then frontiers of the white civilization. The United States was favorable to such desires in so far as they could be permitted and was agreeable to helping and protecting the Indians to a realization thereof. The same general provisions were present in the treaties of each of these five tribes. As to the Creeks, they appear mainly in the Treaties of 1832 (7 Stat. 366, article XIV) and 1856 (11 Stat. 699, articles 4, 14, 15, 17, 18, and 26).

The provision in the Treaty of 1832 is as follows: "The Creek country west of the Mississippi shall be solemnly guarantied to the Creek Indians, nor shall any state or territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them. * * * "

In the Treaty of 1856, article 4 is: "The United States do hereby solemnly agree and bind themselves, that no state or territory shall ever pass laws for the government of the Creek or Seminole Tribes of Indians, and that no portion of either of the tracts of country defined in the first and second articles [the Creek and the Seminole reservations] of this agreement shall ever be embraced or included within, or annexed to, any territory or state, nor shall either, or any part of either, ever be erected into a territory without the full and free consent of the legislative authority of the tribe owning the same." Article 15 of that treaty provides: "So far as may be compatible with the Constitution of the United States, and the laws made in pursuance thereof, regulating trade

and intercourse with the Indian tribes, the Creeks and Seminoles shall be secured in the unrestricted right of self government, and full jurisdiction over persons and property, within their respective limits; excepting, however, all white persons, with their property, who are not, by adoption or otherwise, members of either the Creek or Seminole tribe; and all persons not being members of either tribe, found within their limits, shall be considered intruders, and be removed from and kept out of the same by the United States agents for said tribes, respectively; (assisted, if necessary, by the military;) with the following exceptions, viz. such individuals with their families as may be in the employment of the government of the United States; all persons peaceably travelling, or temporarily sojourning in the country, or trading therein under license from the proper authority of the United States; and such persons as may be permitted by the Creeks or Seminoles, with the assent of the proper authorities of the United States, to reside within their respective limits, without becoming members of either of said tribes." Article 18 provided that "the United States shall protect the Creeks and Seminoles from domestic strife, from hostile invasion, and from aggression by other Indians and white persons, not subject to their jurisdiction and laws. * * * "

The absolute rights of government accorded in the above treaties was, in some degree, modified by article 10 of the Treaty of 1866 (14 Stat. 785). That modification is outlined in the opening paragraph of that article as follows: "The Creeks agree to such legislation as Congress and the President of the United States may deem necessary for the better administration of justice and the protection of the rights of person and property within the Indian territory: Provided, however, said legislation shall not in any manner interfere with or annul their present tribal organization, rights, laws, privileges, and customs. The Creeks also agree that a general council * * * shall be organized in such manner and possess such powers as are hereinafter described."

Thus the Creek Indians existed as a political governmental entity controlled, mainly, only by their own laws, customs and administration with the definite right, protected by the United States, of excluding practically all nontribal members from their territory. Such existence was maintained upon a definitely defined body of land "granted" and "guaranteed by the United States" (Treaty of 1833, 7 Stat. 417, article III) and patented to that tribe "so long as they shall exist as a nation, and continue to occupy the country" so defined (same article). The same general situation existed as to the other four of the Five Civilized Tribes and applied to a block of land of many millions of acres (valuable for agricultural, grazing or mineral purposes) located within the territory of the United States. Such a situation was truly abnormal.

So long as this situation was unexposed to the immediate pressure of the white man and his civilization, it could and did exist. But that pressure came. Such changing conditions came and they developed such crushing power from without and explosive force from within that territory, that what had been merely abnormal and anomalous became impossible. These conditions are too numerous, too varied in detail and too well known to justify enumeration in a judicial opinion. They are developed and described in the early reports of the Dawes Commission, in reports of congressional committees and in the congressional debates (beginning with the Fifty-Second Congress). It is sufficient here to give the merest outline. This territory had become settled on three sides by states. A lawless element had fled into it and had found a more or less secure asylum, to the great uneasiness of the surrounding people. Railroads had been constructed through various parts thereof. Towns of considerable size with permanent improvements had been built therein upon land to which no title could be given. White men had poured in until the census of 1890 revealed almost twice as many whites or nontribal members as there were members of the Five Civilized Tribes. This immigration and development had, for the most part, been with the consent of the tribes. Over these whites, the tribal governments had, in most matters, no control or jurisdiction and could afford to them little protection. In most of the tribes, a few of the more intelligent members had, acting under tribal law, secured to themselves the control and gains from enormous bodies of the tribal land to the exclusion of the less active members. The tribal governments were regarded as unable or unwilling to meet these changed conditions and necessities. From the urgency of this chaotic and unsatisfactory—if not unbearable—situation the first congressional action—sections 15 and 16 of the Act of March 3, 1893 (27 Stat. 612, 645) —came forth as the initial step in a course of legislation which ended with the acts or agreements under which the lands of the Five Civilized Tribes were allotted.

This course of legislation, from its begin-

ning to its end, did not have as its sole purpose the allotment of lands—the change from tribal communal ownership to individual ownership. Such allotment was only an important and necessary feature thereof. The main purpose was to do away with the tribal governments and substitute therefor a regular, orderly government of statehood which could protect all of the inhabitants of this territory and permit its proper settlement and development. This purpose may be gathered from many sources but is expressed as clearly and concisely by Senator Jones and Senator Platt as elsewhere. Early in the same session which passed the above act of 1893, Senator Vest introduced a Joint Resolution, No. 117 (24 Cong. Rec. pp. 17, 78), which was intended *solely* to induce the members of the Five Civilized Tribes "to take homesteads in severalty and to sell the remainder of their land to the United States." 24 Cong. Rec. 78. It contained no suggestion therein of dissolution of the tribal governments. There was no opposition to such disposition of these lands but the resolution met determined opposition and "died" upon the table without reference to committee. Two of the main opponents of this resolution were Senators Jones and Platt, both members of the committee on Indian affairs. Senator Jones (24 Cong. Rec. p. 98) said:

"The joint resolution seems to contemplate the appointment of a commission who shall treat with the Indians of the Five Tribes to induce them to accept their lands in severalty, and this seems to be the sole purpose.

"The question of the condition of affairs in the Indian Territory has attracted the attention of the Senate and of Congress for a long time. Early in the last session my colleague [Mr. Berry] introduced a bill which provided for the appointment of a commission to treat with these Indians, not only to induce them to accept their lands in severalty, but in addition to that to treat with them 'with a view to such an adjustment, upon the basis of justice and equity, as may, with the consent of such nations or tribes of Indians, so far as may be necessary, be requisite and suitable to enable the ultimate creation of a state or states of the Union which shall embrace the lands within said Indian Territory,' and the consideration of this bill by the committee on Indian affairs, to whom it was referred, has already resulted in a proposed amendment to the bill to ratify the Cherokee Agreement, which they believe meets the requirements of the present situation.

"Mr. President, the plain situation in the Indian country is this: Under all the treaties made from 1830 down to this good hour those tribes are guaranteed the right to maintain their governments as they have them. These rights must be first disposed of before our government can extend territorial or state governments over that country, unless we violate our treaties with them. There is no inducement which can be presented, in my opinion, by Congress to those Indians which will lead them to abandon their tribal organization unless we offer them something that they regard as a benefit to compensate them for what they give up.

"The committee on Indian affairs and many members of this body have believed that the only hope of inducing those Indians to abandon their tribal organizations and their tribal governments and to become citizens of the United States is the offer of allowing them to take their lands in severalty in compensation for such action; and the proposition made by my colleague, the Senator from Arkansas, was that steps should be taken to allow those Indians to have their lands in severalty, if at the same time they should become citizens of the United States, and the government should have the right to organize a territorial or state government in that country. The one purpose we have in view, the best thing for the country, the best thing for the Indians, is to take exactly that step; but I submit to the Senate that if the proposition of the Senator from Missouri were carried out and the Indians were authorized to take their lands in severalty there would be no inducement on the face of the earth which we could present to those Indians that would lead them to give up their tribal organization and to become citizens of the United States.

"This matter has been considered by the committee on Indian affairs for a long time. I understand the purpose of the Senator from Missouri to be to have the joint resolution referred to some other committee than the committee on Indian affairs. This subject has been before that committee for a long while, and there is now on the calendar of the Senate a bill to ratify the Cherokee Agreement, the last section of which bill provides:

"'Sec. 6. That the consent of the United States is hereby given to the allotment of lands in severalty within the limits of the country occupied by the Cherokees, Creeks, Choctaws, Chickasaws, and Seminoles; and upon such allotments the individuals to

whom the same may be allotted shall be deemed to be in all respects citizens of the United States. And the sum of $25,000, or so much thereof as may be necessary, is hereby appropriated to pay for the survey of any such lands as may be allotted by any of said tribes of Indians to individual members of said tribes; and upon the allotment of the lands held by said tribes respectively the reversionary interest of the United States therein shall be relinquished and shall cease.'

"This proposition, submitted to the Senate and now pending upon the calendar, accomplishes the purpose in the complete and even-handed way which certainly the government of the United States has in view in this matter, while the proposition of the Senator from Missouri would only give away the single advantage we have, and the only inducement we have to offer those Indians to abandon their tribal organizations and to become citizens."

Senator Platt (pages 100 and 101) said:

"The real question which should interest the American people is the question of whether we can longer endure five separate, independent, sovereign, and almost wholly foreign governments within the boundaries of the United States.

"The joint resolution itself which is under discussion scarcely touches the great question which should interest us most, because it does not in terms look at all to the wiping out of those governments, if I may be pardoned the expression. It looks simply to the matter of allotting the lands in severalty in the Indian Territory and the sale of those which are not allotted. Inferentially, I suppose, it will be claimed that when that is done the time will have become ripe or will have been hastened when the Indians themselves will be content to give up their independent and foreign governments.

"This is not a new question to those who have been serving upon the committee on Indian affairs, and I think the members of that committee are more impressed with the anomalous condition which exists, and which I have in a word described, than perhaps other members of the Senate.

"Now, I desire to state as concisely as I may what is the real condition of these five civilized tribes with reference to our government, and their political conditions. In 1832 the United States Supreme Court, in the case of Worcester v. Georgia, 6 Pet. 515, 8 L. Ed. 483, I believe, decided that the Cherokee Nation was an independent nation, that the United States had treated it as an inde-

pendent nation, and had thus recognized it as such. Following that, in 1835, by a treaty the United States, to the extent of that treaty, recognized the Cherokee Nation as an independent nation. I will read from article 5 of the Treaty of 1835 [7 Stat. 481]:

" 'The United States hereby covenant and agree that the lands ceded to the Cherokee Nation in the foregoing article shall in no future time, without their consent, be included within the territorial limits or jurisdiction of any state or territory.'

"That gave them political independence.

" 'But they shall secure to the Cherokee Nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country, belonging to their people, or such persons as have connected themselves with them—'

"That gives them all legislative and judicial power with the limitations which are expressed in the proviso which follows:

" '*Provided always*, that they shall not be inconsistent with the Constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians; and also, that they shall not be considered as extending to such citizens and army of the United States as may travel or reside in the Indian country by permission according to the laws and regulations established by the government of the same.'

"So that, with those simple restrictions that the nation should not pass laws inconsistent with the Constitution of the United States and the acts of Congress that existed or might be passed regulating trade and intercourse with the Indians, the Cherokee Nation was as much an independent and foreign government as the government of France or of England. That guaranty contained in the original Treaty of 1835 has been continued by other treaties from that day down to the present. Therefore the United States by treaty stands pledged to guarantee to the Cherokee Nation a separate, independent, and in all respects, except so far as the limitations were specified a sovereign government. The other Five Civilized Tribes are practically in the same situation in this respect.

"So we have now this strange and anomalous condition, that within the limits of the United States are five separate, independent governments, with no allegiance to the United States, with no responsibility to the Unit-

ed States government, beyond the reach of the United States government, except in the two limitations which were imposed or reserved by the treaty, that is that they shall not make laws inconsistent with the Constitution of the United States or inconsistent with the laws passed by Congress regulating trade and intercourse with the Indian tribes. Under those guaranties they have established five independent nations or governments of their own."

Page 101:

"The white people are constantly increasing in that country; business is being developed; in the Choctaw and Chickasaw country the white people far outnumber the Indians; comparatively large cities have been built up, and the growth of the white settlements in some portions of this so-called Indian country is almost equal in its rapidity to the growth in Oklahoma. The existing conditions will continue just so long as the citizens of the United States who find their business and carry on their business within this Indian country are outside of the pale of government and outside largely of the pale of law.

"I think the time has come, Mr. President, or if it has not come, it is rapidly nearing us, when either by the consent of the Indians, or without their consent, this condition of affairs must cease. As I have said, the reason for it is all gone, and nobody any longer supposes that there are to be Indian governments here controlling the land and the territory, to the exclusion of white people. The Indians themselves no longer expect or desire to exclude the whites. I do not advocate the violation of our treaties; I want to live up to all our treaties; but at the same time the Indians themselves must see that this condition of things can not much longer continue. They must see to what it leads, and has led them; they must see that within their borders, comprising the fairest lands of the United States, there is a state of affairs existing with regard to the citizens of the United States which the United States government cannot much longer tolerate.

"I believe that the Indians themselves do see this, and I believe that they have themselves been making rapid strides toward the time when they will, all of them, or if not all of them at least a majority of them, be ready to surrender their Indian governments and come under a territorial government, with the idea that eventually they are to become a state or a part of a state of the United States, and be in all respects citizens of the United States."

This purpose has been recognized and stated by the Supreme Court in many cases. In one of these (Choate v. Trapp, 224 U. S. 665, 667, 32 S. Ct. 565, 566 [65 L. Ed. 941]) Mr. Justice Lamar said:

"The Five Civilized Tribes owned immense tracts of land in territory that is now embraced within the limits of the state of Oklahoma. The legal title was in the Tribes for the common use of their members. But the fact that so extensive an area was held under a system that did not recognize private property in land, presented a serious obstacle to the creation of the state which Congress desired to organize for the government and development of that part of the country. And, with a view of removing these difficulties, it provided (March 3, 1893, 27 Stat. 612, 645, c. 209) for the appointment of the Dawes Commission, authorizing it to enter into negotiations with these tribes for the extinguishment of their title, either by cession to the United States or by allotment, in severalty, among their members."

The act of 1893 was the Indian Appropriation Act. Sections 15 and 16 thereof were almost verbatim the bill referred to by Senator Jones as having been introduced by Senator Berry and which was designed to accomplish the above main purpose. In the first sentence of section 15, the consent of the United States to allotments in severalty is coupled with the provision that "upon such allotments the individuals to whom the same may be allotted shall be deemed to be in all respects citizens of the United States." Section 16 created a commission (the Dawes Commission) to negotiate for the "extinguishment of the national or tribal title to any lands within that territory" (of the Five Civilized Tribes), by cession or allotment "or by such other method as may be agreed upon" and the purpose of desiring such extinguishment of title is stated as being "to enable the ultimate creation of a state or states of the Union which shall embrace the lands within said Indian Territory." Further provisions of this section were that the Commission "shall endeavor to procure, first, such allotment of lands in severalty to the Indians belonging to each such nation, tribe, or band, respectively, as may be agreed upon as just and proper to provide for each such Indian a sufficient quantity of land for his or her needs; * * * and, secondly, to procure the cession * * * of any lands not found necessary to be so allotted or divided, to the United States. * * * But said commissioners shall, however, have power er to negotiate any and all such agreements

as * * * shall be found requisite and suitable to such an arrangement of the rights and interests and affairs of such nations, * * * or any of them, to enable the ultimate creation of a territory of the United States with a view to the admission of the same as a state in the Union."

Several things stand out distinctly in these two sections which put beyond doubt the purpose of the United States and the place of allotments in the working out of that purpose. First, the tribes could make allotments and the United States would waive its reversionary interest in the lands but such allottees would thereby become citizens of the United States "in all respects," that is, cease to be subject to tribal government. Second, what the United States had in mind was the creation of regular state governments over this territory which would mean replacement of the tribal governments. To effectuate this end, the United States sought extinguishment of the tribal titles. Whether this extinguishment was by allotment or some other way was simply a question of method. In short, allotment of lands was never more than an important and necessary means to an end. The extinguishment of tribal title to these lands was necessary to get rid of the tribal government. As a matter of fact, allotments of at least enough of the land to give homes to the tribal members was, from the nature of things, a necessary and inevitable part of any plan to extinguish the tribal titles and was the plan expressly preferred (in this act) by the United States. None of these tribes permitted allotments under the act of 1893. The practical importance of that act is that it declared the policy of the United States (Mullen v. United States, 224 U. S. 448, 451, 32 S. Ct. 494, 56 L. Ed. 834; Woodward v. De Graffenried, 238 U. S. 284, 295, 35 S. Ct. 764, 59 L. Ed. 1310) and that it created the Dawes Commission. From that time, that commission was the active administrative agency employed by Congress to further the above policy. Woodward v. De Graffenried, supra, page 295 (35 S. Ct. 764).

The hostile inactivity of these tribes did not prevent Congress from the execution of its policy declared in the act of 1893. The act of 1893 (section 16) provided that "after the terms of such an agreement [allotment] shall have been arrived at, the said commissioners shall cause the lands of any such nation * * * to be surveyed and the proper allotment to be designated." The Indian Appropriations Act of 1894 (28 Stat. 286, 306) made appropriation "for surveying lands in the Indian Territory, known as those of the Five Civilized Tribes, in conformity to the laws applicable to the public domain." Further appropriations were made for the same purpose by succeeding Congresses. The Indian Appropriations Act of 1896 (29 Stat. 321, 339) made it the duty of the Commission to ascertain and make up the rolls of citizens and freedmen in these tribes and provided that such rolls "shall be hereafter held and considered to be the true and correct rolls of persons entitled to the rights of citizenship in said several tribes." Through these acts of 1894 and 1896 Congress had provided for ascertainment of the two mechanical requisites (surveys and citizenship rolls) necessary to work out allotments and which would require time for determination.

The act of 1896 (in connection with this authority to the Commission to make up citizenship rolls) stated (p. 340):

"It is hereby declared to be the duty of the United States to establish a government in the Indian Territory which will rectify the many inequalities and discriminations now existing in said territory and afford needful protection to the lives and property of all citizens and residents thereof."

The Indian Appropriations Act of 1897 (30 Stat. 62, 83 and 84) went far toward annulling the governmental functions of the tribes. It gave full jurisdiction to the United States Court, "original and exclusive," over "all civil causes in law and equity thereafter instituted and all criminal causes for * * * any offense committed after January first, eighteen hundred and ninety-eight, by *any person* in said territory; * * * and the laws of the United States and the state of Arkansas in force in the territory shall apply to all persons therein, irrespective of race. * * * " By that act, citizens of the tribes were qualified as jurors "in any of said courts." Also, all legislative action by a tribal council (except relating to negotiations with the Dawes Commission), after January 1, 1898, must be immediately certified to the President and be ineffective if disapproved by him within 30 days after passage. Thus the judicial power of the tribal governments was largely superseded, the laws of the United States and certain of the laws of the state of Arkansas substituted for many existing tribal laws, and all future tribal legislative power made subject to submission to and veto by the President.

In 1897, treaties, or agreements, had been drawn with the Choctaw and Chickasaw Tribes (30 Stat. 505) and the Creek Tribe (30 Stat. 514), providing for allotments

and/or sale of all the lands of such tribes. These treaties were ratified by the United States (30 Stat. 505, 514) and were to be effective upon the ratification by the members of each of said tribes at elections to be held for that purpose. These treaties failed of ratification by the Indians of these three tribes.

The Curtis Act (30 Stat. 495) was approved June 28, 1898. At the time of its consideration and passage the situation as to the Civilized Tribes was as follows: The tribal governments had been superseded in great part; the surveys and citizenship rolls necessary to allotments completed or in course of completion; none of the tribes had agreed to allotments; and three of them had refused to ratify treaties providing for allotments. The Curtis Act (sections 11–28, inclusive) marked a distinct, progressive step in the general policy initiated in the act of 1893. Congress still was at least doubtful of its constitutional power to interfere with the tribal title to the lands. 31 Cong. Rec. 5552–5555; Woodward v. De Graffenried, 238 U. S. 284, 304, 307, 35 S. Ct. 764, 59 L. Ed. 1310. The Curtis Act was based upon the theory that the tribe was trustee of the land for the benefit of all of the tribal members and that the United States was clothed with authority to see that such trust was truly administered; that the tribe had utterly failed in such duty and permitted certain tribal members (usually intermarried white men) to appropriate the use of vast tracts of tribal land to the exclusion and serious hurt of the other members; that the "use and occupancy of the surface" of the lands, as distinguished from the title thereto, could (within the Constitution and these Indian treaties) be divided among the tribal members; that such division would give practical effect to the objects of the trust. 31 Cong. Rec. 5552, 5553 and 5554; Woodward v. De Graffenried, 238 U. S. 284, 305, 306, 35 S. Ct. 764, 59 L. Ed. 1310. "The Curtis Act had for its object the administration of the trusts imposed upon the several tribes by the early treaties, and which the tribes had failed to enforce, namely, that the beneficial use of the tribal domain should be enjoyed equally by all the members of the tribe, and that monopolization of it in any form or by any means should be prevented." Woodward v. De Graffenried, 238 U. S. 284, 305, 35 S. Ct. 764, 771 (59 L. Ed. 1310). "And the manifest purpose of the Curtis Act was not to displace but to recognize the communal titles, and to administer the use of lands for the equal benefit of the members of the tribes

according to the true intent and meaning of the early treaties; the effort being to do what the tribal governments ought to have done but were failing to do." Woodward v. De Graffenried, 238 U. S. 284, 306, 35 S. Ct. 764, 772, 59 L. Ed. 1310.

This act dealt with a complicated situation in a comprehensive and necessarily detailed manner but a general outline thereof may be stated, omitting provisions which went largely to define or to outline means to accomplish the main purposes thereof. The main provisions of that act were for the allotment of "the exclusive use and occupancy of the surface of all the lands of said nation or tribe susceptible of allotment among the citizens thereof, * * * giving to each, so far as possible, his fair and equal share thereof, considering the nature and fertility of the soil, location, and value of same" (30 Stat. 497, § 11) reserving all mineral deposits, town sites and grounds occupied by schools, burial places, etc., to the tribe for the common benefit; giving local government to municipalities under applicable laws of the state of Arkansas; requiring direct payment, by the United States and not through the tribal governments, to tribal members on a per capita basis, of all moneys due the tribe; "that on and after the passage of this act the laws of the various tribes or nations of Indians shall not be enforced at law or in equity by the courts of the United States in the Indian Territory" (section 26); abolishing "all tribal courts in Indian Territory," and transferring all civil and criminal cases therein to the United States Courts (as to the Creek Nation, after October 1, 1898); that "all citizens of said [Creek] nation, when the tribal government shall cease, shall become possessed of all the rights and privileges of citizens of the United States" (section 37); and resubmitting the above allotment agreements of 1897 with the Choctaw, Chickasaw, and Creek Nations with the provision that, if they should be ratified by the respective tribes before December 1, 1898, "the provisions of this act shall then only apply to said tribes where the same do not conflict with the provisions of said agreement." This act was a decided progress along the policy expressed by Congress in the act of 1893. It practically annulled the tribal governments in so far as those governments prescribed and enforced rules of conduct for their members or citizens; it took from such governments the control over the tribal lands and funds arising therefrom or deposited with the United States; it divided the use and occupancy of

the surface of tribal lands among the tribal citizens and made such use and occupancy exclusive. It took much of the substance from those governments leaving them rather shells of what they had been. But those shells were not emptied entirely. They still held an existence and the title to the tribal lands and property. This existence stood in the way of the main Congressional purpose—"the ultimate creation of a territory of the United States with a view to the admission of the same as a state in the Union" (Act of 1893, 27 Stat. 612, § 16); kept alive the tribal citizenship and prevented passage of title in tribal lands to the tribal members. While a long step toward the goal which Congress had in view, yet it fell much short of full accomplishment. Probably its principal results were to remove the main reasons and to weaken the effective forces which had theretofore prevented the tribes from favorably considering allotment agreements.

We are next to examine what was done affecting the Creeks under the Curtis Act and up to the Allotment Agreements. This is well reviewed by Mr. Justice Pitney in Woodward v. De Graffenried, 238 U. S. 284, beginning at 307, 35 S. Ct. 764, 774 (59 L. Ed. 1310). This statement, also, throws much light upon important provisions in those Agreements. It is as follows:

"But, first, it will be well to briefly review what had been done in the meantime under the Curtis Act, in order that we may the better understand the situation with which Congress dealt in 1901. From the sixth report of the Dawes Commission, at page 9, it appears that while the Atoka Agreement, as proposed by the Curtis Act, was ratified by the Choctaw and Chickasaw Nations at a special election held August 24, 1898, the amended Creek Agreement of September 27, 1897, was not ratified. 'Chief Isparhecher of the Creeks was slow to call an election, and it was not until November 1, 1898, that the agreement with that tribe was submitted in its amended form for ratification. While no active interest was manifested, the full-bloods and many of the freedmen were opposed to the agreement and it failed of ratification by about one hundred and fifty votes. As a result the Act of June 28, 1898, known as the Curtis Act, became effective in that nation.'

"The same report shows (page 18) that the Commission found it impracticable to establish allotment offices in all five of the tribes pursuant to the departmental regulations of October 7, 1898 (set forth below, in the margin), until a proper system and method of procedure should have been devised, established in one tribe, and demonstrated by experience as satisfactory. 'The initiatory work being experimental and requiring the close attention of the Commission, such office was established at Muskogee, in the Creek Nation, where the general office of the Commission is located, thus enabling the Commission to better superintend its operations. Due notice was given by publication, as required by the rules of the secretary, and the office opened for the selection of allotments on April 1, 1899.'

"Page 20: 'Up to and including June 30, 1899, three thousand eight hundred selections were filed on in the Creek Nation.' Seventh Report, p. 31, stated that 'up to and including June 30, 1900, there have been 10,000 selections filed in the Creek Nation, amounting approximately to two-thirds of the total number of citizens, and covering the most thickly settled and improved lands of the nation.'

"These selections were treated as 'preliminary,' and the allotments as 'temporary.' The difficulties to be overcome before complete and final allotment were great and unprecedented. Seventh Report, p. 12. For instance, the Creek citizenship rolls had not been completed at the time of the making of the Agnes Hawes allotment, nor were they, indeed, until some time in the year 1902. It is also to be noted that section 11 of the Curtis Act does not authorize allotments of 160 acres, or any other specified area, but contemplates a valuation of the allottable lands so as to give to each citizen his fair and equal share in value. Evidently, the Secretary of the Interior and the Dawes Commission realized that to postpone the beginning of allotments until the roll of citizenship of any tribe should be 'fully completed as provided by law'—there being disputes without number respecting questions of citizenship, and a mass of litigation arising out of them, as witness Stephens v. Cherokee Nation, 174 U. S. 445, 467 [19 S. Ct. 722, 43 L. Ed. 1041], which involved 166 appeals from the United States Courts in the Indian Territory to this court, taken under the Act of July 1, 1898, c. 545, 30 Stat. 571, 591—would have postponed indefinitely the inauguration of the allotment policy in the Indian Territory. The same result would have followed if allotment had been required to await a valuation, lot by lot, of all the allottable lands. But the immediate inauguration of the policy of allotment was urgently called for, not only to break up the system of land monopolies, productive of so much injustice to the individual Indians, but also to educate the In-

dians in the benefits to be derived from separate occupancy and enjoyment of the land, and thereby to gain popular support for the agreements that were so earnestly desired as the only permanent relief from an intolerable situation.

"There were over 3,000,000 acres of land in the domain of the Creek Nation, and approximately 16,000 Creek Indians and freedmen. It was easily to be seen that the tribe possessed sufficient allottable land to permit each citizen to take 160 acres, assuming the land values were approximately uniform. There were many reasons of convenience and of sentiment indicating the quarter section as a proper provisional allotment. It ran with the lines of the government surveys; it was the quantity permitted to be taken up by a citizen of the United States under the pre-emption and homestead laws (Rev. Stat. §§ 2259, 2289 [Comp. St. § 4530]); it was the quantity proposed to be allotted in the Choctaw-Chickasaw Treaty of 1866, as has been stated; it was the quantity allotted to an Indian, the head of a family, under the General Allotment Act of 1887 (chapter 119, 24 Stat. 388); it was this area that was pointed out as proper to be allotted to an individual citizen of the Five Civilized Tribes by section 15 of the Act of 1893, c. 209, 27 Stat. 645; and, finally, by the amended Creek Agreement of September 27, 1897 (previously rejected by the tribe, but by the Curtis Act required to be resubmitted), 160 acres were to be allotted to each citizen, the residue of allottable lands to be sold in tracts not exceeding that area.

"And so it is not surprising that the Secretary of the Interior, in establishing regulations for the selection of allotments under the Curtis Act, included a clause permitting each Creek citizen to take 160 acres. Extracts from these regulations are set forth in the margin. They contemplated temporary allotments, intended to be approximately equal to what each citizen would get from final allotment.

"Meanwhile the Dawes Commission, after the rejection by the Creeks of the agreement submitted pursuant to section 30 of the Curtis Act, negotiated another agreement with them on February 1, 1899, which, although ratified by the tribe on February 18, was rejected by Congress. Sixth Report, pp. 10, 59. Still another agreement was negotiated under date of April 8, 1900 (Seventh Report, pp. 13, 47), which, with some amendments, was ratified by Congress in behalf of the United States by the Act of March 1, 1901 (31 Stat. 861). It was subsequently ratified by the Creek Nation on May 25, 1901

(Eighth Report, pp. 11, 47; 32 Stat. 1971), and is known as the Original Creek Agreement. It provided for a general allotment of all the tribal lands, except town sites, etc., 160 acres being allotted to each citizen, town lots to be sold, deeds or patents to be made to allottees and purchasers, conveying the tribal title, the residue of lands and all funds arising under the agreement to be used for equalizing allotments, and any deficiency to be supplied out of other funds of the tribe, 'so that the allotments of all citizens may be made equal in value, as nearly as may be.'

"The sections especially bearing upon the present inquiry are sections 6, 7, and 28. These and the other provisions of the Agreement respecting the allotment of lands show that it was the intention of the parties to accept and confirm the allotment work already performed by the Dawes Commission, with the same effect as if it had been done after the ratification of the agreement. This was to adopt what had been done in dividing the lands so far as it had been done consistently with the provisions of the Agreement, and thus save not only the time and expense of the allotment work, but the great confusion and hardship that would necessarily have resulted if the attempt had been made to vacate upwards of 10,000 allotment selections already made, involving the greater part of the improved lands of the Nation and a large majority of the citizens. At the same time the Curtis Act allotments were brought under the provisions of the Agreement respecting the conveyance of the tribal title, etc. We see no evidence of a purpose to put allotments previously made upon a different basis, in any respect, from allotments thereafter to be made; on the contrary, the phrase used in section 6 is that the confirmed allotments 'shall, as to appraisement and all things else, be governed by the provisions of this agreement.' We construe the section to mean that allotments theretofore made, if not inconsistent with the provisions of the Agreement, were to be treated the same as if made after the ratification of the Agreement; and this includes the designation of the beneficiaries in case of the death of an allottee.

"There were reasons for an express ratification of the allotment work previously done by the Commission. As already pointed out, the allotments had been tentatively and provisionally made in tracts of 160 acres, upon the order of the Secretary of the Interior, and without express authorization of acreage allotments in the Curtis Act; they had been made before completion of the membership rolls and without appraisement of the lands;

and, of course, they had been made without the consent of the tribe."

The foregoing necessarily extended statement of the purpose and policy of Congress toward the Five Civilized Tribes, which included the Creek Nation, is not intended to review or even mention every congressional act or every practical consideration which induced or progressed this policy but we think the above sufficiently and clearly outlines such purpose and policy and the more important enactments and history which led up to the Creek Agreements under which the present allotments were made.

This policy was not peculiar to the Five Civilized Tribes,.but, as stated by Mr. Justice Brewer in a case involving Kickapoo Indians (Matter of Heff, 197 U. S. 488, 499, 25 S. Ct. 506, 508 [49 L. Ed. 848]), was "a policy which looks to the breaking up of tribal relations, the establishment of the separate Indians in individual homes, free from national guardianship and charged with all the rights and obligations of citizens of the United States." The Supreme Court has repeatedly stated this purpose and reviewed this legislative policy in cases involving various of the Five Civilized Tribes. Cases involving other than the Creek Nation are in pari materia because this policy moved as a unit as to all of these five tribes except in the culminating Allotment Agreements with the separate tribe which were different in some provisions but not at all in general outline or purpose. Such cases involving the Creek Nation are Harris v. Bell, 254 U. S. 103, 105, 41 S. Ct. 49, 65 L. Ed. 159; Turner v. United States, 248 U. S. 354, 356, 358, 39 S. Ct. 109, 63 L. Ed. 291; Jefferson v. Fink, 247 U. S. 288, 290, 291, 38 S. Ct. 516, 62 L. Ed. 1117; McDougal v. McKay, 237 U. S. 372, 381, 35 S. Ct. 605, 59 L. Ed. 1001; Skelton v. Dill, 235 U. S. 206, 207, 35 S. Ct. 60, 59 L. Ed. 198; Sizemore v. Brady, 235 U. S. 441, 447, 35 S. Ct. 135, 59 L. Ed. 308; Ex parte Webb, 225 U. S. 663, 684, 32 S. Ct. 769, 56 L. Ed. 1248; Tiger v. Western Investment Co., 221 U. S. 286, 299, 31 S. Ct. 578, 55 L. Ed. 738; and Woodward v. De Graffenried, 238 U. S. 284, 293, 35 S. Ct. 764, 59 L. Ed. 1310, which reviews fully this legislation as to the Creeks. Some of the cases involving other of the Five Civilized Tribes are Winton v. Amos, 255 U. S. 373, 379, 41 S. Ct. 342, 65 L. Ed. 684; Wallace v. Adams, 204 U. S. 415, 419, 27 S. Ct. 363, 51 L. Ed. 547; Heckman v. United States, 224 U. S. 413, 432, 436, 32 S. Ct. 424, 56 L. Ed. 820; Mullen v. United States, 224 U. S. 448, 451, 32 S. Ct. 494, 56 L. Ed. 834; Gritts v. Fisher, 224 U. S. 640, 642, 32 S. Ct.

580, 56 L. Ed. 928; Choate v. Trapp, 224·U. S. 665, 667, 32 S. Ct. 565, 56 L. Ed. 941; Stephens v. Cherokee Nation, 174 U. S. 445, 446, 467, 19 S. Ct. 722, 43 L. Ed. 1041.

Not only is this purpose shown by the history of Indian legislation in general and by related legislation as to other of the Civilized Tribes, by the wording of the Agreements themselves and by repeated statements by the Supreme Court, but it is shown by succeeding legislation. According to the Agreements the tribal government was to terminate on March 4, 1906. On March 2, 1906, Congress passed a joint resolution (34 Stat. 822): "That the tribal existence and present tribal governments of the * * * Creek * * * tribes or nations * * * are hereby continued in full force and effect *for all purposes under existing laws until all property of such tribes, or the proceeds thereof, shall be distributed among the individual members of said tribes* unless hereafter otherwise provided by law." Section 28. On April 26, 1906, there was an act (34 Stat. 137, 148) of the same general tenor. This resolution and this act were occasioned by the fact that the allotments had not then been completed (Gritts v. Fisher, 224 U. S. 640, 644, 32 S. Ct. 580, 56 L. Ed. 928) within the time limit of the Agreements. Also, an act was approved March 3, 1901 (31 Stat. 1447), making Indians of the Five Civilized Tribes citizens of the United States, which was especially designed to affect the Indians of those tribes because of the various allotment agreements whereunder "Their tribal governments are to be broken up. * * *" 33 Cong. Rec. p. 6760.

With the above background to aid in construction of those Agreements, we come to a consideration of the controversies raised in these cases as to their meaning.

### The Allotment Agreements and Appellant's Contentions.

The heart of the contention of the United States as to the construction of these two Agreements is as follows: The allotment was to be so as to give to each tribal citizen an equal share, in value, of the whole; the standard of value was 160 acres at $6.50 per acre; each citizen was to have 160 acres; values between tracts to be equalized from tribal funds; the acreage was determined and limited by the survey lines; these lines meandered these streams; to permit an allottee to have the additional land between the meander line and the thread of the stream would give him more than his acreage of 160 acres and an added value not accounted for; such ad-

ditional acreage and value would violate the above standards of allotment based upon a definite acreage and valuation.

It is true that the Agreements contemplated allotments which would give each tribal citizen an equal share in value of the tribal land; that the acreage to each allottee was limited to 160 acres; that all land was to be appraised on the basis of a maximum value of $6.50 per acre; that deficiencies below this maximum valuation were to be made up by money payments; that value was to be the ultimate measure of division; that the allotments followed the survey lines which meandered these streams; that to permit such riparian allottees to take title to the thread of the stream would result in an acreage in excess of 160 acres.

[7, 8] But the above are not all of the provisions of those Agreements and it is our duty to make effective the intention of the parties as expressed in the entirety of the Agreement. Also, we must construe the above and all parts of the Agreements in the light thrown by the purposes they had in view (Levindale Lead Co. v. Coleman, 241 U. S. 432, 437, 36 S. Ct. 644, 60 L. Ed. 1080) and by the conditions surrounding the parties and affecting them *at the time* the Agreements were made (Johnson v. Riddle, 240 U. S. 467, 475, 36 S. Ct. 393, 60 L. Ed. 752; Cherokee Intermarriage Cases, 203 U. S. 76, 89, 27 S. Ct. 29, 51 L. Ed. 96).

Other pertinent provisions are as follows: "All lands belonging to the Creek Tribe of Indians in Indian Territory, except townsites and lands reserved for Creek schools and churches, railroads, and town cemeteries, * * * shall be appraised at not to exceed $6.50 per acre * * *" (32 Stat. 500, § 2); "all lands of said tribe, except as herein provided, shall be allotted among the citizens of the tribe" (31 Stat. 862, § 3); the only reservations from allotments were townsites, certain lands to which railroads had vested rights for railway purposes, ten designated tracts used for school purposes and an orphan home, town cemeteries, one tract used for a university site, one acre each for all schools and churches outside of towns regularly used as such (31 Stat. 868; 32 Stat. 503); allotment "boundaries to conform to the government survey" (31 Stat. 862); residue of lands (after allotment of 160 acres) and all funds arising under this Agreement to be used to equalize and any deficiency to come from tribal funds (31 Stat. 864); all funds of tribe not needed for such equalization to be distributed by Secretary of Treasury to tribal members per capita "on the dis-

solution of the Creek tribal government" (31 Stat. 870; 32 Stat. 503); "no act, ordinance, or resolution of the national council of the Creek Nation in any manner affecting the lands of the tribe, or of individuals after allotment, or the moneys or other property of the tribe, or of the citizens thereof, except appropriations for the necessary incidental and salaried expenses of the Creek government as herein limited, shall be of any validity until approved by the President of the United States" (31 Stat. 872, § 42); "the tribal government of the Creek Nation shall not continue longer than March fourth, nineteen hundred and six, subject to such further legislation as Congress may deem proper" (31 Stat. 872, § 46).

Considering all of these provisions in these Agreements, the main purposes intended to be accomplished by the Agreements and the method by which those purposes were to be so accomplished are clear. The purposes were to dispose of *all* of the lands of the tribe, by allotment or sale; divide *all* tribal funds among the members; and dissolve the tribal government by March 4, 1906. Thus the congressional policy (traced above) which had begun with the act of 1893 was to be fully and finally achieved—the tribal government was to disappear and the tribal members, as individuals, put in possession of the occupancy and title of all of the tribal property and in a position where they could be made citizens of the United States and where a regular territorial or state government could be erected.

Turning now to the conditions surrounding and affecting the parties at the time these Agreements were made. What conditions existed then which would have induced the Creek Nation to desire to retain title to these river beds? At that time those bed lands had no known mineral value and were unsuitable for cultivation or grazing. They were merely sandy waste bottoms over which the water seasonably flowed. The water had its value for various purposes but the land under it had, as such, no value except to the adjoining owner of the bank. Why would the Creek Nation, which was (under the Agreement) to cease existence in about five years, want to retain this valueless land? What did it expect to do with it? How get rid of it? What reason could the tribal members, or any of them have for not wanting this land to pass from the tribe? Had it been known that these lands were underlaid with oil and gas, there would have been every reason to retain these lands (as was done with certain lands of some other tribes where mineral de-

posits were known at the time of allotment) so that all of the tribal members might share in this exceptionally valuable land. But we must construe these Agreements in the light of the knowledge possessed by the parties when they entered into them. In the Curtis Act, which was an allotment merely of occupancy of the surface, there was a general reservation of minerals, whether then known or not, but when it came to the various agreements, which were for allotment in fee, mineral reservations for the benefit of all the tribal members were inserted only where the existence of such minerals was then known or, possibly, believed to exist. It might as well be argued that where oil or coal was discovered under an upland allotment long after patent had passed, such should inure to all the tribal members to prevent an inequality in "value" in allotments.

Therefore, we have this situation: A long pursued purpose of Congress to allot *all* of these lands and distribute *all* tribal funds so that the tribal government and associations should speedily cease; full knowledge by the Indians of that purpose; formal agreement thereto; necessity of such allotment and distribution, both as benefits to the Indians and as a prerequisite step in accomplishing such tribal dissolution: a plan of allotment based on equality of value in land; such allotment to follow survey lines which meandered streams; stream bed lands of no then known value unless as appurtenant to riparian ownership; allotments and patents which have, as to all parties, fully executed these Agreements as to these riparian lands and vested rights in such allottees and purchasers.

[9] To give the Agreements the construction urged by appellees would fully carry out the main thought and purpose of the United States—the only purpose it had in initiating and pursuing the long course of Congressional action which resulted in these Agreements —and would harmonize with what must have been the understanding of the Indians as to that often and clearly declared purpose and as to the effect of those Agreements. To adopt the construction urged by appellant would, for the time being at least, defeat that purpose. The argument of appellant to support this unusual result is twofold: First, that to allow the riparian allottee to have the river bed land would give a greater acreage and value than allowed under the Agreements; secondly, that the lack of expression in the Agreements and patents as to this river bed land should be resolved in favor of the Indians under the rule which requires all doubts in dealings with the Indians to be resolved in their favor.

As to the first point: Viewing the matter as of the time these Agreements were made, as we should, there was no money value in these river bed lands, therefore, there would be no disturbance in the "value" standard of allotment. There would be an excess in acreage but acreage was not the controlling basis of division of lands—it was acreage of a given standard of value. Moreover, this excess in acreage was of land which had no apparent usefulness—at least none in and of itself. It might well be regarded as of no account. Suppose allotment had been attempted on an acreage basis which included this worthless river bed land as part of the 160 acres allotted, would it not have been opposed as unfair and unauthorized? What Congress designed and what the Agreements contemplated was that each allottee should have 160 acres of land, not 150 acres of land and ten acres of sand covered by the fluctuating waters of a bordering stream. The course of dealing by the United States in the disposal of the public lands is suggestive, if not analogous. "It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines." Grand Rapids & Indiana R. Co. v. Butler, 159 U. S. 87, 93, 15 S. Ct. 991, 993 (40 L. Ed. 95).

Also, it will be recalled that the surveys of these Indian lands for allotment were, under the act of 1894 (28 Stat. 286, 306) to be "in conformity to the laws applicable to the public domain." Again, to so construe these Agreements would do violence to the absolute requirements that "all" of the lands were to be appraised and *all* (with exceptions here immaterial) allotted in accordance with "boundaries to conform to the government survey" (31 Stat. 862)—a survey which was then in course and which it was known would employ and was employing meander lines for streams.

[10] As said (respecting the Cherokee Agreement): "The doctrine is familiar that the language of a statute is to be interpreted in the light of the particular matter in hand and the object sought to be accomplished as manifested by other parts of the Act, and the

words used may be qualified by their surroundings and connections." Cherokee Intermarriage Cases, 203 U. S. 76, 89, 27 S. Ct. 29, 34 (51 L. Ed. 96). And again, in speaking of the Osage Allotment Act (34 Stat. 539), the Supreme Court said: "The provisions of the Allotment Act must be construed in the light of the policy they were obviously intended to execute" Levindale Lead Co. v. Coleman, 241 U. S. 432, 437, 36 S. Ct. 644, 646 (60 L. Ed. 1080).

[11] As to the second ground, to wit, the rule of construction in favor of the Indian. No reason or facts are presented to show that these Indians, individually or as a tribe, understood or intended that these river bed lands should remain the property of the tribe. "While the dependent character of the Indians makes it the duty of the court to closely scrutinize the provisions of the treaty and to interpret them 'in the light of the larger reason and the superior justice that constitute the spirit of the law of nations' (Choctaw Nation v. United States, 119 U. S. 1, 28, 7 S. Ct. 75, 91, 30 L. Ed. 306), the court must take care, when using its power to ascertain the intention of the parties, not to disregard the obvious import of the words employed, and thereby, in effect, determine questions of mere governmental policy." United States v. Choctaw, etc., Nation, 179 U. S. 494, 538, 21 S. Ct. 149, 166 (45 L. Ed. 291).

From all the above considerations, we conclude that it was the intention of all of the parties that the title of these riparian allottees conveyed by meander lines should extend to the thread of the stream and that no interest or title was reserved in or retained by the Creek Nation. This view is applicable with like force to purchasers of unallotted lands because such lands were sold under and in accordance with the two Agreements and, obviously, Congress intended no difference, in respect to the matter now under consideration.

Appellees have urged other grounds, than above discussed, why the riparian owner should be decreed owner of the adjoining river beds. We find it unnecessary to discuss them as we think the above fully disposes of this issue in these cases.

The appeal of Sarah Rector (No. 7172) does not present questions which will interfere with the payment to the abutting landowner and/or any lessee thereof of the proper royalty funds in the hands of the receiver and such payment should be promptly determined and made.

The decrees, in so far as they relate to the issue of title, are affirmed. Other portions of the decree involved in the other appeal (No. 7172) by Sarah Rector are determined in a separate opinion filed this day. (C. C. A.) 20 F.(2d) 845.