Cowen, Chief Judge,
delivered the opinion of the court:
This is a companion case to that decided this day in Appeal No. 9-63, The Creek Nation v. United States, ante, p. 483 on appeal from a decision of the Indian Claims Commission.[1] Appellant in its suit before the Commission, relied upon Section 2, Clauses 3 and 5 of the Indian Claims Commission Act of 1946, 60 Stat. 1049, and sought revision of the Allotment Agreements entered into *515 between tbe Creeks and the United States on March 1, 1901, and June 30, 1902, on the grounds of unilateral mistake on the part of the Indians. The Commission granted appellee’s motion for summary judgment on tire ground that appellant’s claim was res judicata, having been decided by this court in The Creek Nation v. United States, 92 Ct. Cl. 269 (1940), cert. denied, 313 U.S. 581 (1940).[2]
Both parties have argued that these two cases present the same issue of law and that they should be decided in the same way. We agree that they do present the same issue of law, though not that urged by the parties. However, the application of the principles required to resolve that issue differs widely in the cases and the results are necessarily opposite for reasons which we shall set forth below. Therefore, the two cases have been considered separately.
The facts underlying this claim have been detailed in our former decision and in United States v. Hayes, 20 F. 2d 873 (8th Cir. 1927). Our recitation of these facts is accordingly brief. Appellant seeks recovery for approximately 28,875 acres of lands constituting the riverbeds of the Arkansas, Cimarron, and Canadian Fivers running through the Creek Nation in Oklahoma. Prior to 1901 and 1902, the Creek Tribe of Indians held a patent, issued by the Government in 1852, to a large body of land, including the riverbed lands. The grant was in fee simple to the Creek Nation as a single entity, and included in the grant was a promise that the grant continued “so long as they [the Creek Nation] shall exist as a nation and continue to occupy the country hereby assigned to them.” In 1901 and 1902, pursuant to a congressional policy looking toward eventual dissolution of the Creek Tribe as a nation, the Allotment Acts of March 1,1901, 31 Stat. 861, and June 30, 1902, 32 Stat. 500, were passed. These acts, and the agreements executed by the Government and the Creek Indians pursuant to them, provided for the allotment to tribal members or sale to other people the Creek lands above mentioned.
The plan of the allotments was to give each tribal citizen an equal share, in value, of these lands. Each member was *516 to receive 160 acres valued at $6.50 an acre, supplemented by tribal funds in cases where the value per acre was less than $6.50. The lots were laid out by a survey made by the Government before the 1901 and 1902 agreements. The survey meandered the banks of the rivers and allotments were made of bordering lands. Neither the survey nor the sales and allotments mentioned the riverbed lands.
In 1912 and 1913, after oil had been discovered in parts of the riverbed lands, the State of Oklahoma (claiming ownership of the riverbed lands as beds of navigable streams) granted oil and gas development leases on parts of the riverbed lands.
In 1922, the Supreme Court held that the Arkansas Elver was not navigable and that the riverbed to the thread of the river was the property of the riparian owners. Brewer Oil Co. v. United States, 260 U.S. 72, 86 (1922).
The Government sued in the United States District Court for the Eastern District of Oklahoma on behalf of the Creek Nation against allottees and other riparian owners to quiet title in the riverbed lands. The court held for the riparian owners on the basis of Brewer Oil Co. v. United States, supra.
This decision was affirmed by the Eighth Circuit Court of Appeals in United States v. Hayes, supra. The court concluded that “it was the intention of all the parties that the title of these riparian allottees (and purchasers of unallotted lands) conveyed by meander lines should extend to the thread of the stream and that no interest or title was reserved or retained by the Creek Nation.” Id. at 890.
In 1930, appellant brought suit against the Government in the Court of Claims under a jurisdictional act of May 24, 1924 (43 Stat. 139, as amended, 45 Stat. 1229 (1929)) asking $150,000,000 as just compensation for the riverbed lands. The Creek Nation v. United States, 92 Ct. Cl. 269. Concerning the claim and the Hayes case, the court said at pages 274 and 275:
We are entirely satisfied with the discussion of this question by the Eighth Circuit Court of Appeals in the case of United States v. Hayes, supra. We agree with that court that there was no evidence before it of any intention on the part of the Nation to reserve to itself title *517 to any of its lands, bnt that, on the contrary, it was the evident intention of all parties that all of its lands should be disposed of and that the Nation should go out of existence and its citizens should become citizens of the United States.
But the plaintiff says the additional proof introduced for the first time in this case shows that this was not the intention of the parties. This proof is that riparian rights were not discussed when the allotments were made. That the title of a riparian owner is presumed to extend to the thread of a nonnavigable stream, we have no doubt, was not mentioned, because the river beds, in the light of what was then known, were valueless, except to the adjoining landowner, and no thought would have been given to it; or, if thought of, it would never have been assumed that the Nation meant to reserve it. Had this matter been mentioned, we cannot, conceive that it would have made the slightest difference to the Nation or its members whether the title stopped at low watermark or went to the thread of the stream.
The fact that it was not discussed is the strongest indication that there was no intention on the part of the grantor to reserve title to it. Would it not be supposed that when the allottee received his patent to the land he took it for granted that he received with it the right to use the adjoining river, that he should have the right of ingress and egress thereby, that he might water "his stock therein, and otherwise use and enjoy it? Did the Creek Nation intend to deprive him thereof, as it would have been able to do had it retained title to the river? We can think of no reason why it should have.
The only question to be decided is whether the summary judgment for appellee was proper under the circumstances. We think it was. While the Commission based its action on res judicata, when the related but different principle of collateral estoppel is involved (see Appeal No. 9-63, supra), we find that the net effect of the decision was to apply that doctrine correctly and to set in repose issues and facts thoroughly explored and disposed of in the prior litigation. The single issue of fact in the previously decided cases and in the present case is that of the intent of the parties as to the riverbeds when they entered into the 1901 and 1902 agreements. The Commission correctly sum *518 marized the effect of the prior court decisions on this point as follows:
United States v. Hayes, supra and Creek Nation v. United States, supra, show thorough exploration and clear decision on the intent of the parties and the circumstances surrounding the allotments and sales of the riverbed lands; and no revision of the written agreements was necessary to do this. 12 Ind. Cls. Comm, at 133.
Except for appellant’s alternative plea based upon fair and honorable dealings, the allegations of the petition in the instant case are almost entirely repetitions of the same allegations in the prior Greek case. In the former action, appellant contended that the Creek Nation intended to reserve title to the riverbeds; that the Allotment Agreements neither granted nor reserved the riverbeds, and that the appellant understood that the meander lines shown in the deeds, patents and other conveyances were boundaries only, but did not understand that such conveyances would also convey, by implication, appellant’s domain in the riverbeds. Appellant also urged at that time that in drafting the patents and allotment deeds, the United States left the matter ambiguous and open to construction, and permitted a technical rule of interpretation to divest the title of the Creek Nation to the riverbed lands.
In its request for findings of fact, in its brief and in its motion for new trial in the prior litigation[3] appellant asserted that in the Hayes case, the Government had failed to present evidence of the intention of the parties to the Allotment Agreements and that appellant’s purpose was to present evidence lacking in the Hayes case — evidence showing that the Indians intended that the riverbed lands were to be reserved from allotment for the use and benefit for all the members of the tribe. The evidence offered by appellant in the trial of the case before this court included the testimony of an Oklahoma judge and seven prominent Creek Indians. In general, the purport of their testimony was that the Allot *519 ment Agreements bad been entered into by the Indians in the mistaken belief that each allottee would receive 160 acres and no more and that if the Indians had understood that the doctrine of riparian rights would be applicable, they would never have ratified the Allotment Agreement of 1902.
It was also the position of the appellant in the former litigation that the United States, in its entire handling of the matters affecting the Creek Nation, failed to perform its obligation as a guardian of the Indians and caused the riverbed lands to be divested from the tribe without its knowledge and contrary to its understanding.
After hearing all the evidence, including the additional testimony offered for the first time, this court made the following finding of fact
7. At the time the allotments to the individual members of the tribe were made the question of whether or not the title of the riparian owner stopped at the low watermark of the stream or extended to the thread of the stream was not discussed. It was, however, the purpose of all the parties that all of the lands in the Creek Nation, except those expressly reserved for certain named purposes, should be either allotted or sold, and that the Creek Nation should go out of existence and that the citizens thereof should become citizens of the United States. In making the allotments and selling the land adjoining these rivers, it was not the intention of the Creek Nation to reserve for itself the river beds of those streams.
As we pointed out at some length in the companion case, Appeal No. 9-63, one of the principal purposes of the Indians Claims Commission Act was to create new causes of action where none existed before. Consequently, we hold that the doctrine of res judicata is not applicable in this action. However, it is altogether clear that the present suit is foreclosed by the doctrine of collateral estoppel as defined and explained in Commissioner v. Sunnen, 333 U.S. 586 (1948). In the application of collateral estoppel, no issue may be heard again on its merits where a court has previously heard and considered the facts relative to that issue and made a specific and definitive finding thereon. Thus *520 the factual issue that was litigated by the parties and found by this court, as set out above, is binding on the parties in this subsequent suit for revision of the Allotment Agreements.
In addition to what we have said above, the record before the Commission and before us shows that appellant has not offered to present any evidence material to the issue that was not presented before. Accordingly, appellant has had its day in court on the issue of its intent as to the reservation of the riverbed land and is not entitled to be heard again on the merits in its action to revise the Allotment Agreements. This is so even though this court, which handed down its decision prior to the passage of the Indian Claims Commission Act, could not have revised the agreements to supply language inconsistent or in conflict with the express terms thereof. Choctaw Nation v. United States, 318 U.S. 423 (1900) and Choctaw and Chickasaw Nations v. United States, 179 U.S. 494 (1894). Consistently with these Supreme Court cases, however, this court in the prior litigation could have construed the agreements, accompanying deeds, and other documents in a manner that would supply the alleged missing intent urged by appellant now and in the former suit. It is clear that the court could have taken such action under the accepted liberal rules of construction accorded to Indian treaties and agreements when they were, as in this instance, silent on the matter and when the addition of the proposed chink in that gap of silence would not be inconsistent with the plain terms of the agreements.
In the alternative, appellant asserts that the former decision does not preclude a trial upon its claim because it is based in part upon the principle of fair and honorable dealings as set forth in Section 2, Clause 5 of the Indian Claims Commission Act. 'In support thereof, appellant generally alleges that the white man’s law of riparian ownership was forced on the Indians; that the Government failed in its duty to draft the patents for lands 'bordering on the streams in, a manner that would have excluded the riverbeds; that the inclusion of the riverbeds gave the riparian allottees more *521 than 160 acres and thus violated the allotment agreements; that the Government failed in its duty to preserve and protect its dependent Indian ward from the loss of its property, and that the mistakes and negligence of the Government were in violation of the exacting fiduciary standards applied against the United States in behalf of its Indian ward.
The white man’s law of riparian ownership was applied in the absence of evidence that the Indians cared otherwise. The evidence which was heard and considered by the court showed that the Indians, and everyone else for that matter, considered the riverbeds to be valuable only in conjunction with the riparian lands. The Government’s inability to foretell that oil would be discovered in the riverbed some 10 years later was hardly a breach of its fiduciary duty to protect the property of its ward. The fact that some allottees received slightly more than 160 acres of land is not sufficient to establish that the Government acted negligently or that it dealt unfairly or dishonorably with the Indians.
Aside from the broad allegation that it is entitled to redress under the principles of fair and honorable dealings, plaintiff has failed to demonstrate it has anything of substance in support of its alternative plea that was not offered, considered, and decided adversely to it in the former action.
That the plan of the United States to dissolve the tribe and end its ownership of land eventually was found impracticable long after 1901-02 is irrelevant for consideration of the events of those years. As we found in Blackfeet and Gros Ventre Tribes v. United States, 127 Ct. Cl. 807, 818, 119 F. Supp. 161 (1954), cert. denied, 348 U.S. 835 (1954), “The ‘fair and honorable dealings’ clause has no application to the facts of this case.”
Although the Indian Claims Commission based its dismissal of appellant’s petition on the ground that the prior litigation in this court was res judicata, rather than upon the properly applicable principles of collateral estoppel, the Commission reached a correct result. Therefore, its decision, as modified herein, is affirmed.

Affirmed

 12 Ind. Cls. Comm. 123 (1903).

 Ibid.

 (See Defendant’s Exhibits 2 and S.)