**The SEMINOLE NATION OF OKLAHOMA**

**v.**

**The UNITED STATES.**

**Appeal No. 3–73.**

United States Court of Claims.

Feb. 20, 1974.

Paul M. Niebell, Washington, D. C., attorney of record, for appellant.

M. Edward Bander, Washington, D.C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for appellee. A. Donald Mileur, Washington, D.C., of counsel.

Before DURFEE, Senior Judge, DAVIS and SKELTON, Judges.

DAVIS, Judge:

After its removal from the east during the first part of the 19th century, the Seminole Nation became the owner in fee of a large area which is now Seminole County, Oklahoma, but was then within Indian Territory. *Cf.* Choctaw Nation v. Oklahoma, 397 U.S. 620, 622–626, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970). By Article V of the Treaty of March 21, 1866, 14 Stat. 755, 757–58, the Nation granted a railroad right-of-way over this land, plus the right to buy strips up to three miles on each side of the tracks, "*to any company which shall be duly authorized by Congress.*" In 1888 Congress gave such authorization to the Choctaw Coal and Railway Company (now part of the Rock Island system); construction took place during 1889 and 1890. In 1896 a second authorization went to the St. Louis, Oklahoma and Southern Railway Company (later part of the Frisco), and the line was built in 1900 and 1901. Another permission was given in 1902 to the Enid and Anadarko Railway Company (which became a segment of the Santa Fe) for track laid in 1905 and 1906.

Under the authorizing statutes as supplemented, the three railroads obtained, among other things, a relatively narrow

right-of-way and also the right to certain lands outside of the right-of-way for station purposes (called "station reservations"). In partial return, the company was to pay for the Indians' benefit a stated sum per mile of rail constructed (a payment not now involved), together with fifteen dollars per mile per year for so long as the territory was owned and occupied by the Nation.

In the 1920's the Seminoles brought suit in this court against the United States, under a special jurisdictional act, asserting that the railroads had failed to comply with the treaty and statutes in that they had taken and held for their own unlawful benefit "station reservations" unnecessary for railroad purposes and had received rents and profits from these lands, and also that they failed to pay the annual mileage charge after Oklahoma entered the Union in 1907. The Government was charged with breaching its obligations by allowing the roads to commit these acts; the relief sought was that the United States idemnify the claimant for the value of the lands allegedly wrongfully taken, for rents and profits accruing from the companies' use of such land, and for the unpaid mileage charge. This court decided for the Government, 97 Ct.Cl. 591, 723 (1942), and in 1943 the Supreme Court affirmed. Creek Nation v. United States, together with Seminole Nation v. United States, 318 U.S. 629, 63 S.Ct. 784, 87 L.Ed. 1046.[1]

After the passage of the Indian Claims Commission Act in 1946, the Seminole Nation presented the very same sets of facts to the Commission under the "fair and honorable dealings" clause (§ 2, clause 5, 25 U.S.C. § 70a). That tribunal, with two members dissenting, rejected the claim after trial.[2] 27 Ind.Cl.Comm. 141 (1972), rehearing denied, 29 Ind.Cl.Comm. 422 (1973).

The Seminoles have appealed, asking us to reverse the Commission and hold in their favor. The appeal is expressly limited to the $15 per mile annual charge and to the "station reservations."

A. *The $15 per mile annual charge:* With respect to the Government's refusal to collect the $15 per mile charge after Oklahoma became a state in 1907, the Commission correctly held that appellant was foreclosed by the Supreme Court's 1943 decision.

In that litigation, the Court rejected the Seminoles' then argument that the Secretary of the Interior had breached the 1866 treaty and the various railroad statutes in taking the position that the $15 charge was no longer payable once the state was created, and in refusing to sue the railroads for those sums. Mr. Justice Black's opinion for the majority said, first, that "[t]he $15.00 charge was considered a tax, approximately equal to the taxes charged by neighboring states," and, second, that there was nothing to indicate "that the United States, acting as a voluntary tax collector for the tribes, meant to guarantee to the tribes that the taxpayers would make their payments when due." 318 U.S. at 637, 63 S.Ct. at 788.

■ Accepting as we must the Supreme Court's opinion and decision, we cannot see how the Nation can now prevail on its claim that the Government treated it less than fairly and honorably on this very same matter. The high court's ruling tells us authoritatively that the Government did not go counter to any relevant treaty or legislation. *Cf.* Suquamish Tribe v. United States, 197 Ct.Cl. 775, 779 (1972). The contention is advanced, however, that, even if there was no breach of agreement or statute, the United States nevertheless failed to live up to its common law fiduciary obligation as guardian of its Indi-

---

1. The Creek Nation had pursued a comparable claim.

2. By agreement, the parties limited their proofs to facts relating to the right-of-way and one station reservation (at Seminole,

Oklahoma) of the Rock Island, with the right reserved to appellant to present the facts relating to the other railroad companies and the remaining Rock Island station reservations if the decision on liability should go in the Nation's favor.

an wards. One difficulty with this position is that the 1943 opinion seems infused with the view that the Government was free from any such legal, equitable or moral obligation to go against the railroads if it decided not to; the Court said, for instance, that there was "no mandatory duty on the Secretary to do the work of collecting" (318 U.S. at 637, 63 S.Ct. at 788), that the Secretary had very wide discretion in determining when to institute legal proceedings (318 U.S. at 639, 63 S.Ct. 1046), that "the government did not mean to assume an insurer's responsibility" (318 U.S. at 640, 63 S.Ct. at 789), that the Indians had power to sue for themselves (318 U.S. at 640, 63 S.Ct. 784), and while "[a]ppreciating the desire of Congress to recognize the 'full obligation of this nation to protect the interests of a dependent people' [citing case], we are unable to find in the words of the treaties or statutes upon which this action rests any such *prodigal* assumption by the government of other people's liabilities as that for which the petitioners [the Indians] contend here." 318 U.S. at 640, 63 S.Ct. at 790 (emphasis added). The basic postulates underlying and coloring these words are very hard to reconcile with the possibility that the Government may have breached some non-statutory (or non-treaty) fiduciary duty.

More dispositive is the square substantive holding that the $15 charge was "a tax, approximately equal to the taxes charged by neighboring states." 318 U.S. at 637, 63 S.Ct. at 788. In this connection the Court cited (318 U.S. at 632, n. 5, and 637, n. 15, 63 S.Ct. 784), seemingly with approval, an opinion of the Secretary of the Interior holding that the railroads' obligation to make this payment terminated upon the admission of Oklahoma as a state in 1907. This administrative ruling (38 Pub.Land Dec. 414 (1910)) explained that (a) the mileage charge was not part of the compensation payable to the Indians for use of their land, nor was it a property tax upon the land, but was instead "in the nature of a franchise tax or charge upon the business of the corporation constructing the road"; (b) at the time the tax was imposed "there was no State or Territorial government except that of the Indian tribes or nations, and the payment of the annual charge of fifteen dollars per mile was exacted by Congress for the benefit of the tribal governments"; (c) although the tribes continued to exist for certain purposes after Oklahoma became a state, "they no longer exercise the functions of a political government, as the tribal government has been superseded by that of the State"; and (d) "after the admission of the State of Oklahoma the Indians ceased to own and occupy the lands in the sense in which that expression is used in the acts of Congress" imposing the mileage charge. 38 Pub.Land Dec. at 417.

We think that the Supreme Court accepted this chain of reasoning when it characterized the $15 payment as a "tax, approximately equal to the taxes charged by neighboring states," and cited the Secretary's decision "for an analysis of the nature of this tax." It necessarily follows that the railroads were not liable for the charge after Oklahoma's admission, and the Federal Government did not act less than fairly or honorably in failing to sue them for monies they did not owe. Even if we were to read the 1943 opinion more narrowly, as stopping with its designation of the charge as a tax without exploring the consequences of that description, we would have to agree that the Secretary's conclusion is the logical implication once the payment is seen as the tax the Court and the Secretary deemed it to be. Only if the charge were part of the compensation for allowing the railroad to use the Indians' land could it continue after Oklahoma joined the Union—and the Secretary and Court have flatly held that it was not such compensation.

Appellant ripostes with the thread-bare generality that a demand under the "fair and honorable dealings" clause of the Claims Commission Act of 1946 presents a new claim which was

not, and could not be, before the Supreme Court in 1943 under the special jurisdictional act. We have made it clear that this is not enough, by itself, to do away with the defense of collateral estoppel or issue preclusion. Each case must be examined to see what was actually decided in the prior litigation and to appraise the bearing of that decision on the current claim. *See* Creek Nation v. United States, 168 Ct.Cl. 483, 494–498 (1964); Creek Nation v. United States, 168 Ct.Cl. 512, 519–521 (1964); United States v. Creek Nation, 196 Ct.Cl. 639 (1971), cert. denied, 406 U.S. 929, 92 S. Ct. 1771, 32 L.Ed.2d 132 (1972); United States v. Creek Nation, 476 F.2d 1290, 201 Ct.Cl. 386 (1973). If the factual or legal issues determined in the earlier case are sufficient to dispose of the new cause of action for less than fair and honorable treatment, the prior ruling is conclusive, not as a matter of res judicata but under the normal application of the principles of collateral estoppel. *See, e.g.* United States v. Creek Nation, *supra*, 476 F.2d at 1299–1300, 1302–1303, 201 Ct.Cl. at 401–402, 406–407.

That is the situation in this instance. The Supreme Court's decision in 318 U. S. leaves nothing substantial for appellant to urge (with respect to the mileage charge) on its present claim of other than fair and honorable dealings. That happens, of course, to be a new type of demand, but this novel claim is wholly disposed of and foreclosed by the points made by the Court and the issues decided in 1943. It is impossible, in other words, for us to find less than fair and honorable dealings without going contrary to some significant aspect of what the Court there determined.

The Indians contend that, even if this be so, they are free to reopen the issues already resolved because they have new arguments to make. But these arguments are not new issues, never presented to the Supreme Court, but simply new subsidiary reasoning in further support of appellant's position on the questions actually decided. *See* ALI, Restatement of the Law Second, Judg-

ments (Tentative Draft No. 1, 1973), § 68, comment c, pp. 148, 149. In any event, we consider the allegedly "new" points to be so minor and cumulative that they could not have affected the Court's ruling.

In the same vein, the Seminoles invoke the doctrine that collateral estoppel crumbles when there has been a sufficient change in the legal climate. *See* Commissioner v. Sunnen, 333 U.S. 591, 599–600, 68 S.Ct. 715, 92 L.Ed. 898 (1948). There has, no doubt, been a marked shift since 1943 in several aspects of Indian law but we cannot say that there has been any such change with respect to the narrow considerations and circumstances on which the nature of this mileage charge turns. Nothing suggests that what the Supreme Court (in 1943) and the Secretary (in 1910) thought to be a governmental tax would now be viewed as compensation to the Seminole Nation. That is the crucial question, and as to it we can discern (and appellant suggests) no hint of movement in the legal wind or weather.

B. *Station reservations*: In section 14 of the Act of February 28, 1902, 32 Stat. 43, 47, Congress provided that railroads in then Indian Territory could take and condemn lands, additional and adjacent to the right of way, for "station grounds" (and other specified purposes); section 15 required full compensation for such takings "to the individual owner, occupant, or allottee of such lands, and to the tribe or nation through or in which the same is situated." Four years later, section 14 of the Act of April 26, 1906, 34 Stat. 137, prescribed that with respect to land reserved to a railroad for "station grounds" (among other uses) the company could acquire full title under regulations of the Secretary of the Interior at a valuation to be determined by him "but if any such company shall fail to make payment within the time prescribed by the regulations or shall cease to use such land for the purpose for which it was reserved, title thereto shall thereupon vest

in the owner of the legal subdivision of which the land so abandoned is a part, except lands within a municipality the title to which, upon abandonment, shall vest in such municipality." 34 Stat. at 142.

As part of their prior suit under the special jurisdictional act, the Seminoles (as we have mentioned) alleged that the railroads took and held station reservations which were unnecessary for railroading, and reaped rents and profits from those tracts. The Supreme Court refused any federal liability for such conduct, under the treaties and statutes, on the related grounds that the Government had no mandatory duty under the then law to sue the companies but rather a very broad discretion—and also that the Indians could have sued on their own behalf. 318 U.S. at 638–640, 63 S. Ct. 1154.

This decision does not preclude the present claim.[3] The Court dealt only with the liability of the United States under existing treaties and legislation— this was the only type of suit permitted by the special jurisdictional act—and it necessarily accepted the various statutes, including the 1902 and 1906 Acts, as its datum. Appellant is now attacking a portion of the 1906 Act itself, and perhaps also some of the 1902 statute—as an Indian claimant can do under the "fair and honorable dealings" clause. The fairness and honor of the provisions of the 1902 and the 1906 Acts concerning station reservations was not subjected to examination or decision in the earlier litigation. It was, however, proper-

ly before the Commission below, and is now before us.

There is agreement on the background of this facet of the claim: In 1906 the Rock Island designated, under section 14 of the 1902 Act, *supra*, some 13.76 acres in the Town of Seminole, then Indian Territory, as station grounds.[4] The railroad did not acquire title as it could have under the 1906 Act, *supra*,[5] nor was compensation ever paid to the appellant. The company has, however, continued to hold this land and currently leases 22 tracts thereon to private companies and individuals. No station was erected on the acreage and it is not now and has never been used for railroad purposes.

Appellant's basic point is that this continued holding by the company of property not used for railroading, and to which title was not timely obtained under the 1906 Act, *supra*, is admittedly unlawful under the 1906 Act, but the Tenth Circuit has made it clear that the Seminole Nation cannot recover the land since Congress, in the same 1906 law, provided that in those circumstances title was to vest in the abutting landowners for land outside a municipality, or in the municipality for lands within its boundaries.[6] This congressional transfer of title to the adjoining owners and the municipalities is challenged as inequitable.

The reference in the 1906 legislation to "the owner of the legal subdivision of which the land so abandoned is a part" recalls the Congressional policy, begun in the 1890's, to allot the Seminole tribal

3. With respect to the station reservations, the Commission did not rest on preclusion or collateral estoppel but reached the merits.

4. By agreement, this is the only station reservation as to which proof was or had to be offered. *See* note 2, *supra*.

5. Under the Secretary's regulations the road had until March 1, 1909 to purchase the tract.

6. *See* United States v. Magnolia Petroleum Co., 110 F.2d 212 (C.A. 10, 1939); United States v. Drumb, 152 F.2d 821 (C.A. 10, 1946); Seminole Nation v. White, 224 F.2d

173 (C.A. 10), cert. denied, 350 U.S. 895, 76 S.Ct. 153, 100 L.Ed. 787 (1955); Chickasha Cotton Oil Co. v. Town of Maysville, Okla., 249 F.2d 542 (C.A. 10, 1957); St. Louis-San Francisco Ry. v. Town of Francis, 249 F.2d 546 (C.A. 10, 1957); St. Louis-San Francisco Ry. v. Walter, 305 F.2d 90 (C.A. 10, 1962); Choctaw and Chickasaw Nations v. Atchison, Topeka and Santa Fe Ry., 396 F. 2d 578 (C.A. 10, 1968), cert. denied, 393 U. S. 1048, 89 S.Ct. 677, 21 L.Ed.2d 690 (1969); Choctaw and Chickasaw Nations v. St. Louis-San Francisco Ry., 396 F.2d 582 (C.A. 10, 1968), cert. denied, 393 U.S. 1048, 89 S.Ct. 677, 21 L.Ed.2d 690 (1969).

lands to individual members of the Nation. *Cf.* Choctaw Nation v. Oklahoma, 397 U.S. 620, 627, 90 S.Ct. 1328, 25 L. Ed.2d 615 (1970). Under the Seminole Agreement of December 16, 1897 (ratified July 1, 1898), 30 Stat. 567, all tribal lands were to be allotted as equally as possible (with minor exceptions). This process of allotment began in 1901 and was completed in 1908, but the titles were not actually delivered until 1912–1914. Thus, the original owners of the subdivisions in which the station reservations were located would be Seminole allottees (though as time went on much of this land was transferred out of Indian ownership).

1. The principal contention is that the Federal Government acted unfairly toward the Nation when it adopted the provision of the 1906 Act giving title to abandoned station reservations to abutting owners and municipalities. This is said to have been an uncompensated transfer of the Nation's property to others. *Cf.* United States v. Creek Nation, 295 U.S. 103, 109–110, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); Lipan Apache Tribe v. United States, 180 Ct.Cl. 487, 500 (1967).

▆▆▆▆ Insofar as appellant bottoms this claim on the Act's vesting of title to the station land in the subdivision owners, we hold like the Commission that the case has not been made. It was not unfair or less than honorable for Congress to decide, after the adoption and implementation of the policy of allotting almost all of the Seminole tribal lands, that areas abandoned by the railroads should go to the nearby individual allottees, rather than to the tribe as a whole. The orginal allottees were Indians, members of the Seminole Nation, and accord-

ingly that particular benefit of the 1906 Act would be retained, at least in theory, for Seminoles. Since the purpose of the 1897 Seminole Agreement was to divide "all" Seminole tribal lands (with few exclusions) "among the members of the tribe so that each shall have an equal share thereof in value, so far as may be" (30 Stat. 567), it was not unjust to place ownership of the abandoned station lands in the adjoining allottees' hands. In this connection, one must remember that it is a familiar common law principle that railroad easements, when abandoned, revert to the abutting landowners.[7] Congress could reasonably call upon that old proposition, especially since the adjoining owners were Seminoles themselves (or their successors in interest).

These being the circumstances, it would be wooden and unjustified to apply here, as the Nation would have us do, the general principle that Congress should not turn over to "others", without compensation, an Indian tribe's land. This land did not truly go to "others" but to the individual Seminoles, members of the Seminole Nation, who were the ones most concerned because they were nearest to the property.[8]

2. Appellant's minor argument to support its position on the station tracts which Congress vested in the adjoining allottees is that, in any event, it was a violation of fair and honorable dealings to allow the railroads to carve out any station reservations in the first place. On this, the salient point urged is that the 1866 Seminole Treaty envisaged only one railroad (not three) through Seminole territory, and only a right of way (not additional "station grounds" outside or adjacent to the right of way); Congress is said to have unilaterally

---

7. *See* United States v. Magnolia Petroleum Co., 110 F.2d 212, 217–218 (C.A. 10, 1939); Seminole Nation v. White, 224 F.2d 173, 175 (C.A. 10, 1955); St. Louis-San Francisco Ry. v. Town of Francis, 249 F.2d 546, 548 (C.A. 10, 1957).

8. Any suggestion of inequality between the Seminoles who would benefit from this pro-

vision of the 1906 statute and those who would not (because their lands did not abut a station reservation) would relate to individual claims of the latter, and would not at all be cognizable under the Indian Claims Commission Act—certainly not at the instance of the appellant.

gone beyond this limited agreement in its Oklahoma railroad legislation.

■■ Perhaps the understanding in 1866 (when the treaty was negotiated) was that only one road would be constructed through Seminole territory (*cf.* Creek Nation v. United States, *supra,* 318 U.S. at 631–632 n. 3, 63 S.Ct. 784), but the actual language of the instrument grants a right of way "to any company which shall be duly authorized by Congress," 14 Stat. at 757–758—words which can readily cover a number of roads. In either case, the treaty is not dispositive. Congress could exercise its right of eminent domain to take Indian lands for public purposes (with compensation), and an interstate railroad plainly falls within that class. Cherokee Nation v. Southern Kansas Ry., 135 U.S. 641, 655 ff, 10 S.Ct. 965, 34 L.Ed. 295 (1890). It was not less than fair and honorable to subject Indian groups to the condemnation power in the same way as non-Indians and the states whose consent did not have to be obtained. *Ibid.* Appellant can claim no higher or special status, nor if otherwise treated fairly could it demand that its consent had to be secured.

This eminent domain authority also suffices for the station reservations, even if one accepts the appellant's doubtful proposition that the grant of a right of way, and the right to purchase adjacent lands mentioned in the 1866 treaty, 14 Stat. at 758, do not implicitly cover such additional "station grounds." We can see, moreover, no inequity in the pattern or working out of the station reservation legislation of 1902 and 1906—aside from the vesting of ownership to abandoned tracts in the municipalities (which we consider *infra*). The 1902 Act recognized (§ 15, *see supra*) that proper compensation should be paid, and, as the Commission pointed out, the statute "provided ample protection of the rights of the tribes and allottees as against the railroads in the event of controversy over the taking and use of any lands by the railroads under the statutes." 27 Ind.Cl.Comm. 141, 150 (1972).

As we have stressed, the Supreme Court's 1943 ruling (318 U.S. 629, 63 S. Ct. 784, 87 L.Ed. 1046) determined that there was no breach by the Federal Government in its railroad policy of any relevant treaty or statute. The "common law" obligation of the United States as fiduciary toward the Indians was not justiciable under the special jurisdiction act, but, as we observe in Part A, *supra,* it is very difficult, if not impossible, to harmonize the statements in the Court's opinion with the view that the Government failed in any extra-statutory (or extra-treaty) fiduciary duties. It is obvious that the Court thought that the United States had no responsibility, equitable or legal, for suing the railroads (assuming that the latter were acting wrongfully). As for the substantive content of the railroad legislation, the Court stated that the Government "undertook through its administrative and legislative policy to aid the tribes to hold possession of their lands" and "[i]n view of the pressures of the time, it appears to have treated its obligation with real care"—citing various provisions of the railroad legislation relating to these Oklahoma Indians. *See* 318 U.S. at 634–636, 63 S.Ct. at 787. The Court which promulgated these and the other views expressed in the opinion (*see* Part A, *supra*) could not, if the question had been squarely presented, have deemed the Government's general course of dealings with these Indians (in relation to railroads) to be less than fair or honorable.

■ The Supreme Court's opinion would not, of course, be an obstacle under clause 5 if we believed that there has been a significant change—a development relevant to this particular case —in the standard of equity and fairness toward the Indians. With the exception of the criteria for evaluating the part of the 1906 Act giving title to abandoned station reservations to the municipalities (*see infra*), we can see (as we have already indicated) no such modification pertinent to the Seminoles' current claim. It follows that, this exception

aside, we do not fault the Commission for concluding that the substantive contents of Congress's station reservation legislation, whether taken as a whole or in separate pieces, did not contravene the standard of fair and honorable dealings.

■ 3. The vesting of abandoned station reservations in municipalities is another story. Neither the Commission nor the defendant has set forth any adequate reason why the municipality, which is wholly unrelated to the Seminole Nation, should receive free, without any compensation to the Nation (or to the individual allottees), land which is potentially useful and valuable. The general rule, as we have pointed out above, is that tribes should normally be paid when their recognized or fee property is transferred by Congress to ·others outside of the tribe. Unless there is some good ground for departing from this principle, an uncompensated transfer, unilaterally imposed by Congress, could not be deemed fair.

The only reasons given us for not applying this rule to this case are dry and technical, and even as such do not stand up. It is suggested, as one argument, that by March 1, 1909 (the earliest date railroads could be officially considered under the 1906 Act as having abandoned station reservations) all the Seminole land had been allotted, and, therefore, if anyone was injured by Congress' vesting of title in municipalities, it would be the allottees, not the Nation itself. But so far as we can determine the individual allotments uniformly excepted rights to land forming the station reservations,[9] and accordingly neither any individual allottee nor all of

them together (as allottees) were given any right to these tracts. The residual fee title remained in the Seminole Nation, and when the 1906 Act provided that title to abandoned station reservations lying within a municipality should vest in the municipality it was the Nation's property which was being transferred without compensation.[10]

■ It is also intimated that there would be no purpose in having the station reservations (described as long, narrow strips of land) retained by a tribal organization which was winding up its affairs and would no longer have significant land holdings of its own. Even if this were proved (which it has not been), the fact would not excuse the Congress' failure to insist on due compensation. There is no reason to believe that any or all of the station grounds were wholly valueless, and the Nation was entitled to adequate payment if it was thought necessary or proper to hand over these strips into non-tribal ownership.

Finally, it is said that there is no proof that any station reservations went to municipalities under the 1906 statute (rather than to abutting landowners). The parties agreed (see note 2, *supra*) that the only proof which had to be offered at the trial below (re station reservations) was as to the Rock Island's reservation at Seminole, Oklahoma, and that the claimant reserved its rights as to other station reservations of the three railroads. It is clear, therefore, that appellant was under no duty to prove, at the proceedings below, that other reservations went to a municipality; and it

9. *Cf.* Chickasha Cotton Oil Co. v. Town of Maysville, Okla., 249 F.2d 542, 543, 544–546 (C.A. 10, 1957) ; St. Louis-San Francisco Ry. v. Town of Francis, 249 F.2d 546 (C.A. 10, 1957).

10. Section 27 of the 1906 Act provided that lands belonging to the Seminole tribe "shall be held in trust by the United States for the use and benefit" of the Indians comprising the tribes and their heirs. 34 Stat. 137,

148. See Choctaw Nation v. Oklahoma, 397 U.S. 620, 627, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970). The Nation continued in existence, even after the implementation of the allotment policy, for the purpose of the ownership of lands continuing as tribal property. Cherokee Nation v. State of Oklahoma, 461 F.2d 674, 678 (C.A. 10) cert. denied, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972).

is now free to make such proof in the remand proceedings before the Commission. In any event, it appears that the reservation at Seminole lies within a municipality. Defendant's brief to this court (p. 21) states unqualifiedly that the Commission correctly determined that "the title to the lands within the town of Seminole became vested in the town of Seminole," citing Chickasha Cotton Oil Co. v. Town of Maysville, Okl., 249 F.2d 542, 544, 546 (C.A. 10, 1957). Seminole is a town which was settled about 1890. Hammond's Ambassador World Atlas 359 (1956).

We conclude that the Commission erred with respect to the station reservations located in municipalities. It was not fair and honorable for the 1906 Act to vest those tracts in the municipalities without providing fair compensation to the Seminole Nation. The United States is properly liable, under the fair and honorable dealings clause, for the monetary damage suffered by appellant through this statute. We leave to the Commission on remand to determine the appropriate compensation—whether it should be fair value as of the date of vesting in the towns and cities, the rents and profits derived from the lands, a combination of both standards, or some other measure.[11]

The end result is that we affirm the Commission except with respect to any station reservations located within municipalities. On that aspect we hold the defendant liable and remand for the determination of the amount of recovery.

Affirmed in part, reversed in part, and remanded,

[11]. The defendant is very wide of the mark when it urges that appellant has no standing under the fair and honorable dealings clause (clause 5) to point to railroad activities after March 1, 1909, because the abandoned station reservations became vested as a matter of law, under the 1906 Act, in the adjoining owners or the municipalities on that date. Clause 5 is not limited to legal rights, and the Nation can show that the destruction of its legal rights, as of March 1, 1909, even if constitutional, caused it injury which should now be redressed in fair measure under that provision of the Claims Commission Act. If the railroad's gains after March 1909 are taken into account, it will not be because appellant is "legally" entitled to such sums but because those gains are considered an appropriate and equitable measure of redress under clause 5.