**Edwin James DOHERTY**

v.

**The UNITED STATES.**

No. 416–70.

United States Court of Claims.

July 19, 1974.

Gary G. Quintiere, Washington, D.C., attorney of record for plaintiff. Miller & Chevalier, Washington, D.C., of counsel.

Leslie H. Wiesenfelder, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before DAVIS, KASHIWA, and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

Plaintiff sues for just compensation for the alleged taking by federal law enforcement officers of his camper-bodied pick-up truck and personal belongings. The vehicle, with its contents, was declared forfeited to the United States because of its use in smuggling marijuana into this country from Mexico. The forfeiture is attacked as a deprivation of property invalid under the Fifth Amendment unless compensated, and the seizure of the vehicle and contents is also said to be illegal under the Fourth Amendment. There are cross-motions for summary judgment; the facts are undisputed and indisputable.

During the early morning hours of November 14, 1969, Immigration Inspector Hudson was keeping "still watch" over a border area suspected of being an entry point for illegal Mexican immigrants. His position was about one hundred to one hundred fifty yards from the border, one mile west of Jacumba, California, and adjacent to U.S. Highway 80. After several hours wait he observed a red Datsun camper approach from the east, pull onto a dirt road, and make a sharp U-turn. The engine was turned off, and the lights extinguished. Although his vision of the camper, about thirty yards distant, was obscured, he heard the sounds of doors opening and closing, the crackling of dry brush, and again the opening and closing of doors. He reported these events via radio to three other immigration inspectors stationed nearby.

The vehicle departed, heading east. It was very shortly intercepted and stopped by the other officers. A search of the inside of the camper, testified to be for illegal aliens, turned up two burlap sacks containing thirty kilograms of marijuana in brick form. Plaintiff Doherty, the truck's owner, and Willard Hansma were in the camper; they were arrested and turned over to a special agent of the Bureau of Customs, along with the seized vehicle and contraband. The same day or very soon thereafter the Customs Bureau effected a forfeiture of the camper and its contents under 19 U.S.C. § 1595a(a):

> \* \* \* every vessel, vehicle, animal, aircraft, or other thing used in, to aid in, or to facilitate, by obtaining information or in any other way, the importation, bringing in, unlading, landing, removal, concealing, harboring, or subsequent transportation of any article which is being or has been introduced, or attempted to be intro-

duced, into the United States contrary to law, whether upon such vessel, vehicle, animal, aircraft, or other thing or otherwise, shall be seized and forfeited together with its tackle, apparel, furniture, harness, or equipment.

Doherty and Hansma were indicted on November 19th for violations of 21 U.S.C. § 176a and 18 U.S.C. § 545.[1] By a Customs Bureau letter of November 21st, the former received notice of the forfeiture and of his right to petition for remission from or mitigation of this penalty under 19 U.S.C. § 1618:

> Whenever any person interested in any vessel, vehicle, merchandise, or baggage seized under the provisions of this chapter, or who has incurred, or is alleged to have incurred, any fine or penalty thereunder, files with the Secretary of the Treasury under the customs laws or under the navigation laws, before the sale of such vessel, vehicle, merchandise, or baggage a petition for the remission or mitigation of such fine, penalty, or forfeiture, the Secretary of the Treasury, if he finds that such fine, penalty, or forfeiture was incurred without willful negligence or without any intention on the part of the petitioner to defraud the revenue or to violate the law, or finds the existence of such mitigating circumstances as to justify the remission or mitigation of such fine, penalty, or forfeiture, may remit or mitigate the same upon such terms and conditions as he deems reasonable and just, or order discontinuance of any prosecution relating thereto.
> * * *

The letter informed Doherty that he could get immediate possession of the truck and its contents, without prejudice to his right to petition, by posting its appraised value, $1245.00.[2] He did so and the property was returned in January 1970. Although plaintiff claims that he made oral inquiries of various Government officials about return of the $1245.00, it is conceded that no mitigation or remission petition was filed within the sixty-day time limit (established by regulation, 19 C.F.R. § 171.-12(b)) or thereafter.

Both Doherty and Hansma were tried and convicted in the Southern District of California on all counts of the indictment. Plaintiff's conviction was upheld on appeal, 441 F.2d 1168 (C.A. 9, 1971) cert. denied, 409 U.S. 888, 93 S.Ct. 194, 34 L.Ed.2d 145 (1972). He received a seven-and-one-half-year prison sentence which he is apparently serving.

The theory of this suit is that the forfeiture statute, 19 U.S.C. § 1595a(a), *supra,* is unconstitutional, both on its face and as applied to plaintiff, and therefore that the defendant must pay just compensation for taking the truck. We have jurisdiction because 28 U.S.C. § 1491 covers such monetary claims against the United States founded on the Constitution.

## I

The Government's initial defense is that plaintiff's action is wholly barred by the failure to exhaust his administrative remedy. By his own admission, he never submitted, within the applicable time limit, a petition for remission or mitigation under 19 U.S.C. § 1618, *supra.* In the Government's view, the omission of that step precludes his attack on the forfeiture statute.

1. Charges under the former statute were: conspiracy to transport marijuana, smuggling marijuana, and transporting marijuana with knowledge of its illegal importation into the United States; under the latter the crimes charged were: smuggling merchandise, and concealing smuggled merchandise.

2. Plaintiff sues to recover this amount, plus $500.00 as damages for the temporary depri-

vation of his property. The Customs Bureau letter also said: "Personal property remaining in a seized vehicle must be claimed within sixty (60) days from date of seizure. If not claimed within this period the property will be treated as abandoned merchandise and disposed of."

We hold, however, that the administrative procedure prescribed in 19 U.S.C. § 1618 is irrelevant here. The scope of the Secretary's discretion is explicitly described; he can reduce or set aside the forfeiture only if it was incurred "without willful negligence or without any intention on the part of the petitioner to defraud the revenue or to violate the law" or if there are "mitigating circumstances." But plaintiff's demand skirts around these conditions. In view of his criminal conviction, he does not, and cannot, contend that he was without willful negligence or fraudulent intent, nor does he point to circumstances in mitigation of his guilt. He says, rather, that the forfeiture provision is invalid even as to one who cannot properly obtain remission or mitigation under 19 U.S.C. § 1618. For that precise claim a. petition to the Secretary would be useless since, as defendant concedes, the Secretary cannot consider challenges of this constitutional dimension under 19 U.S.C. § 1618.[3] If follows that pursuit of the administrative remedy was unnecessary for the only claim plaintiff makes, and that that claim can now be maintained in court. *Cf.* Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948).

■ Though plaintiff has this right he must also shoulder, as he does, the consequences of his election to forego administrative relief. Just as the Court in *Lichter* canvassed the validity of the Renegotiation Act by positing against those contractors the non-constitutional issues they could have, but did not, present to the Tax Court, so shall we have to assume that plaintiff cannot meet the conditions for remission or mitigation—that he did not act without

willful · negligence or intent to defraud the revenue or to violate the law, and that there. were no mitigating circumstances.[4] His constitutional attack on the forfeiture provision must be launched from that point of disadvantage.

## II

On the constitutional question, the most recent forfeiture decision by the Supreme Court is the dispositive guide. Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L. Ed.2d 452 (1974). That opinion puts into focus the earlier ruling in United States v. United States Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L. Ed.2d 434 (1971), which plaintiff characterizes as radically transforming the law of forfeiture and on which he builds his argument.

*Coin and Currency* involved the forfeiture of money found in the possession of a man who was arrested for failing to register as a gambler and pay the gambling tax imposed by 26 U.S.C. §§ 4411, 4412 and 4901. Because the money was found to have been used in violation of those laws it was sought to be forfeited to the United States under 26 U.S.C. § 7302. The Court had previously held that, since gambling violated a great number of state and federal criminal statutes, the privilege against self-incrimination was a complete defense to a criminal prosecution for failure to observe the registration-payment scheme.[5] The *Coin and Currency* decision expanded that defense to a forfeiture action based on transgression of the same criminal statutes.

The present plaintiff sees in *Coin and Currency* the broad holding that forfei-

---

3. It is not reasonable to interpret "mitigating circumstances" as including the unconstitutionality of the forfeiture statute itself. It would be highly unusual for so important a question of constitutionality to be entrusted to the official administering the remission-and-mitigation provisions, and if that were the purpose far more explicit words would have been used.

4. His conviction would, in any event, make it impossible, or at least exceedingly difficult, to argue otherwise.

5. *See* Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S. Ct. 709, 19 L.Ed.2d 906 (1968).

tures tied to conduct which can violate the criminal law are always to be treated as criminal penalties, subject to all the constitutional limitations affecting such sanctions. He notes that the opinion stated (401 U.S. at 718, 91 S.Ct. at 1043):

> From the relevant constitutional standpoint there is no difference between a man who "forfeits" $8,674 because he has used the money in illegal gambling activities and a man who pays a "criminal fine" of $8,674 as a result of the same course of conduct. In both instances, money liability is predicated upon a finding of the owner's wrongful conduct; in both cases, the Fifth Amendment applies with equal force.

The Government attempted in *Coin and Currency* to counter with the point that a forfeiture under 26 U.S.C. § 7302 can be effected without regard to the guilt of the money's owner. The Court chose, however, to read that statute coordinately with the applicable mitigation provision, 19 U.S.C. § 1618 (set out above). The result was the conclusion that the owner's involvement in lawbreaking was crucial. "When the forfeiture statutes [at issue there] are viewed in their entirety, it is manifest that they are intended to impose a penalty only upon those who are significantly involved in a criminal enterprise." 401 U.S. at 721–722, 91 S.Ct. at 1045.

Since the same mitigation provision applies to forfeitures under 19 U.S.C. § 1595a(a), the statute in this case, and because of similarities in the wording and purpose of that Act and the forfeiture provisions in *Coin and Currency*, Doherty asserts that § 1595a(a) is likewise intended to apply only to those "significantly involved in a criminal enterprise." Treating the forfeiture, then,

as a "routine criminal penalty," he insists that it is defective because the punishment meted out is potentially disproportionate to the degree of guilt, and invidiously discriminates between co-defendants by (in certain cases) imposing more severe penalties on some than on others.[6]

Calero-Toledo v. Pearson Yacht Leasing Co., *supra,* seems to us to have undermined plaintiff's fundamental contention that statutory forfeitures, even those comparable to the one in *Coin and Currency,* must always and for all purposes be seen exclusively, and judged strictly, as criminal penalties, like a jail sentence or a fine. In holding that a forfeiture may validly be imposed against an innocent owner of property used by a lessee in violation of the criminal law, the Court declared that *Coin and Currency* did not overrule prior decisions sustaining forfeitures as sanctions against persons who were not found to be criminals. *Calero-Toledo* retraces the history of forfeiture provisions in Anglo-American law and revitalizes the many decisions which have refused to measure them only by precise criminal law standards and principles.

■ Forfeitures of the type before us are not exclusively "criminal" in the strict sense. They are hybrid in character. On one side they are related to the criminal process because intimately connected with the enforcement of the criminal law, and because the protections of the Fourth Amendment and the Fifth Amendment privilege against self-incrimination apply to forfeiture proceedings. United States v. United States Coin and Currency, *supra;* Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).[7] But in spite of the punitive and deterrent aspect of the sanctions, they have been regarded by

---

**6.** The statute is attacked as unconstitutional on its face, and also as applied to Doherty because, although he and Hansma were equal confederates in the crime, only Doherty was subject to the forfeiture.

**7.** *Coin and Currency* still stands for the proposition that the owners of property used in gambling activities have a Fifth Amendment defense to forfeitures based on violation of the federal gambler-registration legislation.

the Supreme Court in other respects as "civil", with criminal law concepts inapplicable. Forfeitures have been held not to violate the double jeopardy prohibition, and the guilt of the property owner has not been considered a constitutionally necessary element. *See, e. g.,* Calero-Toledo v. Pearson Yacht Leasing Co., *supra;* One Lot Emerald Cut Stones v. United States, 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972); U. S. ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943); Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938); Goldsmith-Grant Co. v. United States, 254 U.S. 505, 41 S.Ct. 189, 65 L.Ed. 376 (1921). Although forfeitures have a unique historical background (see *Calero-Toledo,* 416 U.S. 663, 680–684, 94 S.Ct. 2090–2092), they have for the most part been treated as a civil penalty, akin to those imposed on tax evaders:

> \* \* \* To ensure full and honest disclosure, to discourage fraudulent attempts to evade the tax, Congress imposes sanctions. Such sanctions may confessedly be either criminal or civil. \* \* \*
>
> \* \* \* \* \* \*
>
> Congress may impose both a criminal and a civil sanction in respect to the same act or omission; for the double jeopardy clause prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense. \* \* \*
>
> \* \* \* \* \* \*
>
> Forfeiture of goods or their value and the payment of fixed or variable sums of money are other sanctions which have been recognized as enforcible by civil proceedings since the original revenue law of 1789. [citation omitted] In spite of their comparative severity, such sanctions have been upheld against the contention that they are essentially criminal and subject to the procedural rules governing criminal prosecutions. \* \* \*

Helvering v. Mitchell, *supra,* 303 U.S. at 399–400, 58 S.Ct. at 633.

■ Some forfeitures may be dominantly criminal, calling for criminal proceedings (see Connecticut Action Now, Inc. v. Roberts Plating Co., 457 F.2d 81, 85–88 (C.A. 2, 1972)), but that is not true of 19 U.S.C. § 1595a(a), *supra.* Its wording, history, nature, and related legislation (*e. g.,* 19 U.S.C. § 1604) show that it is a civil penalty, to be enforced, where necessary, by a civil proceeding, and subject (with important exceptions) to the constitutional oversight for civil matters.

■ Such civil forfeitures are upheld by the courts both because they are deeply rooted in our legal traditions, and also because they are a regulatory and remedial complement to the criminal sanctions imposed by legislatures. "Forfeiture of vehicles bearing smuggled goods is one of the time-honored methods adopted by the government for the repression of the crime of smuggling." General Motors Acceptance Corp. v. United States, 286 U.S. 49, 56, 52 S.Ct. 468, 470, 76 L.Ed. 971 (1932). As the Court said in Calero-Toledo v. Pearson Yacht Leasing Co., *supra:*

> Plainly, the Puerto Rican forfeiture statutes further the punitive and deterrent purposes that have been found sufficient to uphold, against constitutional challenge, the application of other forfeiture statutes to the property of innocents. [Footnote omitted.] Forfeiture of conveyances that have been used—and may be used again—in violation of the narcotics laws fosters the purposes served by the underlying criminal statutes, both by preventing further illicit use of the conveyance and by imposing an economic penalty, thereby rendering illegal behavior unprofitable. [Citations omitted.] 416 U.S. at 686, 94 S.Ct. at 2093.

The footnote following this passage expands on the same theme. "Seizure and forfeiture statutes also help compensate the Government for its enforcement efforts and provide methods for obtaining security for subsequently imposed penal-

ties and fines. [Citation omitted]." (*Ibid.*, 416 U.S. at 687 n. 26, 94 S.Ct. at 2094). In this connection, it is settled that the penalty of forfeiture does not lose its civil character merely because more than the precise amount of "actual damages" to the Government may be recovered. U. S. ex rel. Marcus v. Hess, 317 U.S. 537, 550–552, 63 S.Ct. 1379 (1943).

■ The forfeiture statute and the actual forfeiture in this case both serve these same purposes. Doherty's vehicle was being used by drug smugglers in the same way as was the yacht in *Calero-Toledo*.[8] If the camper can once again be used for illegal importation, because it was physically returned to plaintiff, he has at least suffered the economic penalty of the loss of his $1245. And although the record does not suggest what the apprehension and prosecution of Doherty, and the seizure of the marijuana, cost the Government, we can assume that the forfeiture imposed on him would help to defray that expense.

Plaintiff argues that a forfeiture can in some cases be so disproportionate to the seriousness of the underlying offense that it offends basic notions of justice.[9] We need not deal with the fictitious details of hypothetical cases. "It is said that a Pullman sleeper can be forfeited if a bottle of illicit liquor be taken upon it by a passenger, and that an ocean steamer can be condemned to confiscation if a package of like liquor be innocently received and transported by it. Whether the indicated possibilities under the law are justified we are not called upon to consider. \* \* \* When such application shall be made it will be time enough to pronounce upon it." Goldsmith-Grant Co. v. United States, 254 U.S. 505, 512, 41 S.Ct. 189,

191 (1921). Plainly, the facts before us do not suggest a forfeiture so egregiously disproportionate to the offense which prompted it as to justify a finding of unconstitutionality on that ground.

■ There is equal lack of merit in plaintiff's contention that the forfeiture statute invidiously discriminates between partners in crime. Once again, it is unnecessary to pass upon every outrageous scenario the imagination can conjure up; we need consider only the present situation. Two persons were apprehended in the act of smuggling; both were tried and convicted, but only one was penalized by a forfeiture of his property used in the transaction. We do not think that this difference effects a denial of equal protection violating the Fifth Amendment. Apart from the so-called "suspect classifications", categorization by the legislature must pass only the modest constitutional test that the classification be reasonable. *See, e. g.*, Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). It is not irrational to penalize, through the loss of their investment, those who capitalize a criminal venture by throwing useful property into the illegal partnership, while not subjecting to this risk those who furnish only their personal services. Doherty aided the criminal arrangement by furnishing both himself and his truck, while Hansma supplied only himself. It is not arbitrary to take account of this significant difference in amount and quality of participation. There is no violation of equal protection or due process.

We hold, therefore, that 19 U.S.C. § 1595a(a), *supra*, is not invalid on its face or as applied to this plaintiff.[10]

8. The *Calero-Toledo* opinion did not directly discuss forfeitures imposed upon persons, like plaintiff, who were personally involved in the criminal enterprise, but we cannot believe that the Supreme Court meant to apply stricter rules of reasonableness and due process to such forfeitures than to those of the property of innocents like the plaintiffs in that litigation.

9. The brief suggests the anomaly of a yacht's being forfeited because of some smuggled perfume on board, as opposed to the lack of a forfeiture penalty on a criminal using a stolen or rented vehicle to illegally import a large quantity of heroin.

10. Even before *Calero-Toledo*, two circuits had upheld after *Coin and Currency*, federal

## III

■■ The other of plaintiff's points is that the forfeiture was fatally tainted by an illegal search and seizure. The Fourth Amendment has been held applicable to forfeitures of this kind, and a valid forfeiture cannot be grounded upon an unconstitutional seizure. One Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); Boyd v. United States, *supra*. In the criminal proceeding the District Court upheld the search of Doherty's camper, and the Ninth Circuit affirmed. 441 F.2d 1168 (C.A. 9, 1971), cert. denied, 409 U.S. 888, 93 S.Ct. 194, 34 L. Ed.2d 145 (1972). Arguing that the law on "border searches" has since been changed by the Supreme Court, plaintiff asks us to disregard these earlier rulings in the criminal case.

The recent decision in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), does beam new light on the subject of searches at and near the national borders by customs and immigration officers. If the Doherty seizure involved a true "border search"—a search at or in the area of the border without probable cause[11]—we might not feel precluded from re-examining anew the issue of legality. See Seminole Nation of Oklahoma v. United States, 492 F.2d 811, 203 Ct.Cl. 637 (February 1974) (slip op. at 6); *cf.* Restatement, Second, Law of Judgments § 68.1(b), at 170, 175–76 (Tent. Draft No. 1, 1973).

But the District Court's proceedings show that the stoppage and search was upheld, not as a "border search" *simpliciter*, but as based on probable cause. The judge said, after detailing the facts: "So that is the basis of my ruling that he had probable cause at that time to suspect that they were engaged in some illegal activity with respect to contraband merchandise, and that is why he did what he did * * * ." The judge did refer to the search of the camper-truck as a "border search", but we believe that this was merely a descriptive characterization of the circumstances surrounding the search and not a repudiation of the express finding that there was adequate probable cause.

Plaintiff notes that the Ninth Circuit, in summarily affirming Doherty's conviction, cited two cases dealing with alleged "border searches" of automobiles made without probable cause. But the Court of Appeals spoke before *Almeida-Sanchez*, and reference to this earlier, perhaps more expansive, kind of "border search" could simply have been an alternative ground for affirming the District Court; the Ninth Circuit did not reverse the finding that there was probable cause, or intimate that a proper finding to that effect had not been made, or indicate that it was by-passing the trial court's determination. We conclude that that finding was accepted on the appeal.

Warrantless searches of automobiles en route, made with probable cause, have been upheld since Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L. Ed. 543 (1925). As we have said, the District Court, after hearing argument and taking evidence, found that there was probable cause for the search; that finding, accepted on appeal, is conclusive here under the principle of collateral estoppel. Armstrong v. United States, 173 Ct.Cl. 944, 968–972, 354 F.2d 274, 289–291 (1965). The search is therefore valid for the purposes of the forfeiture as well as for use at the criminal trial.

forfeiture provisions comparable to 19 U.S. C. § 1595a(a). United States v. One 1967 Ford Mustang, 457 F.2d 931 (C.A. 9), cert. denied, 409 U.S. 850, 93 S.Ct. 59, 34 L.Ed.2d 92 (1972); United States v. One 1970 Buick Riviera, 463 F.2d 1168 (C.A.5), cert. denied, 409 U.S. 980, 93 S.Ct. 314, 34 L.Ed.2d 244 (1972).

11. In *Almeida-Sanchez* no probable cause existed for the search, and its attempted justification was under the expanded power of the Government to search, without probable cause, entrants into this country at or in the region of the border. See 413 U.S. at 268, 93 S.Ct. 2535, 37 L.Ed.2d 596.

In any event, on the facts presented to us by the parties (see *supra*, at the beginning of this opinion), we come to the same conclusion as the District Court. The area where Doherty and his companion were observed to have stopped their truck in the middle of the night was at most 150 yards from the border, and was suspected to be a smuggling route because tracks had been found indicating the possible entry of illegal aliens and contraband. After the truck stopped, the lights were turned off, and officer Hudson heard noises which sounded to him like doors opening and closing; these noises were followed by the crackling of dry brush. Hudson concluded from these crackling sounds, which lasted for about half a minute, that there was more than one person outside the vehicle. The doors then opened and closed again, the truck started up, and began to return in the general direction from which it had come. Another officer, alerted by Hudson's radio message, saw a vehicle headed in his direction from Hudson's, about 3 minutes after the radio report. He followed it, and apparently recognized it as the camper-truck described by Hudson; he then overtook it, caused it to stop, and asked the occupants to get out.

These facts reveal cause to stop the vehicle as probably engaged in the criminal activity of transporting illegal entrants or smuggled contraband. The location close to the border, with suspicious tracks already there, the dead of night, the sudden stop on a dirt road, the doused lights, the manifest exit of people from and return to the truck, the apparent activity in the brush around and near the vehicle, the quick driving off back onto the highway in the direction from which the truck had come—all these combine to show probable cause to stop the car. Plaintiff picks away at these facts in an attempt to prove that it was impossible to infer that contraband or illegal entrants were being deposited or loaded, but, as the District Judge said, commonsense tells us that, in the precise and particular situation, the officer's suspicions were solid enough to justify his actions and to call for a search.

After the vehicle was stopped, there were new elements emphasizing the presence of probable cause. The camper which was about 5 ft. high by 4 ft. wide by 5 or 6 ft. deep) was locked. When asked for the key, Doherty replied that it had been lost for three to four weeks. However, the key was then revealed on Doherty's person during a weapons patdown.[12] In the camper there were two burlap bags with protrusions looking similar to the size and shape of marijuana bricks with which the searching inspector was familiar. The bags were then opened and found to contain the drug.

Given the cumulative impact of these circumstances, we hold that there was probable cause for the search, which did not need a warrant, and that there was no taint of illegality in stoppage, search, or seizure. There is no need to consider whether the same conclusion could be reached on the ground that, because of the location, this was an authorized "border search" dispensing with any need for probable cause.

The end-result is that the forfeiture withstands plaintiff's attacks, and he is not entitled to recover. Defendant's motion for summary judgment is granted, plaintiff's is denied, and the petition is dismissed.

---

12. At the very least the officers had, at this point, a "reasonable suspicion", sufficient to justify a pat-down for concealed weapons under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).